# Illinois Official Reports

## Appellate Court

---

### *People v. Brown*, 2020 IL App (1st) 190828

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE BROWN, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-19-0828 |
| Filed<br>Rehearing denied<br>Modified opinion filed | August 11, 2020<br>September 3, 2020<br>September 14, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 1996-CR-26470; the Hon. Timothy Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Karl Leonard, David B. Owens, and Debra Loevy, of The Exoneration Project at University of Chicago Law School, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE COGHLAN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Andre Brown, was convicted of murder in connection with the 1996 shooting death of Enrique Fuentes (Enrique). No physical evidence connected him to the crime, but he was identified at a showup by five eyewitnesses. The State's theory of the case was that Brown, a member of the Blackstone street gang, mistakenly believed Enrique to be a member of a rival gang.

¶ 2    In 2016, Brown filed a postconviction petition asserting his actual innocence and alleging that his due process rights were violated. Following a third-stage evidentiary hearing, the trial court denied his petition, and Brown now appeals. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND
¶ 4                        Trial Evidence and Proceedings
¶ 5    At around 7 p.m. on September 30, 1996, Enrique and his brother, Leodegareo Fuentes Roman (Leodegareo), were sitting outside a store on the corner of 48th Street and Laflin Street in Chicago. A man approached on a bicycle, shot Enrique multiple times, and then fled eastbound. Based on a contemporaneous witness report, the police issued a radio dispatch to look for a black male riding a mountain bike and wearing a black jacket, black cap, and dark pants.

¶ 6    Less than five minutes later, Officer Mike Ward encountered Brown riding his mountain bike three blocks south of the shooting on Laflin Street. Brown was wearing a black-and-white Oakland Raiders jacket over a dark shirt with white stripes, a black knit cap with a white Nike swoosh on the front, and black pants. Ward observed that Brown was riding slowly and did not appear to be in a hurry, but he was sweating profusely and breathing heavily, and when Ward did a protective pat down of Brown, his heart was beating rapidly. Ward did not find a gun on Brown's person. Officers later conducted a thorough search of the area, including the path they thought Brown might have traveled, and could not find the murder weapon.

¶ 7    Ward brought Brown to the scene of the shooting in a squad car, with the tire of Brown's bicycle visibly sticking out of the trunk. Brown was wearing the black cap and black jacket when he was placed in the squad car. At the scene, officers were stationed with the witnesses, keeping them apart and making sure they did not speak with each other. Ward conducted a showup of Brown to five witnesses: Leodegareo, Timothy Hopper, Karla Navarette, Don O'Reilly, and Juan Campos. All five witnesses identified Brown at the scene and, later, at trial.

¶ 8    Leodegareo testified that neither he nor his brother were gang members. At 7 p.m. on the day of the shooting, they were sitting outside the store at 48th Street and Laflin Street when a man on a bicycle approached them. A Hispanic man was talking with Enrique but ran away as the cyclist drew near. The cyclist stopped around 10 feet away from the Fuentes brothers, lifted

his shirt, and pulled a gun from his waistband. Enrique lifted his hands and said, "No, bro," and then the cyclist shot him "seven [or] eight times."

¶ 9    Police and paramedics arrived on the scene. Enrique was taken away by ambulance and later died of his injuries. Approximately 10 to 15 minutes after the shooting, an officer brought Leodegareo to a squad car in which Brown was sitting. Based on Brown's face and his clothes, Leodegareo identified him as the shooter.

¶ 10   Hopper testified that he lived in an apartment with a clear view of 48th Street. At 6:30 p.m. on the day of the shooting, from his second-story window, he noticed a man on a mountain bike cycling back and forth in front of his house for around 15 minutes. Hopper did not pay much attention at first, since cyclists were common in the neighborhood, but started watching him closely because he did not leave. When Hopper first saw the cyclist, it was still daylight, although the sun was starting to set; nothing obstructed his view, and he could see the man clearly. He observed the cyclist was a black man wearing a black knit hat, a black jacket with "maybe a couple of white stripes," and dark pants.

¶ 11   Hopper saw the cyclist ride a block away, towards 48th Street and Laflin Street, and lift up his jacket, revealing a gun. Hopper called 911, described the cyclist, and then ran outside so he could report to police where the cyclist went. He heard two gunshots and then "clearly" saw the cyclist standing at the corner of 48th Street and Laflin Street, firing several more shots. Afterwards, the cyclist headed eastbound on 48th Street.

¶ 12   Shortly afterward, an officer asked Hopper whether Brown, who was sitting in a squad car, "was the person that did the shooting." Hopper did not initially identify Brown because "by then it was dark" and he could not see him clearly. The officers later took Brown out of the squad car. Once Hopper "could see his face," he identified Brown as the shooter. At the time he made his identification, he was not told that others had also identified Brown.

¶ 13   Navarette was 16 when the shooting occurred. At around 7 p.m., she was walking home past the corner store at 48th Street and Laflin Street. She saw a man on a mountain bike wearing a skull hat and black jacket and riding in circles on 48th Street. She kept her eyes on him the entire time because he "seem[ed] suspicious." After she passed Laflin Street, she heard gunshots and ran to her house. She did not actually see anyone firing a gun. After the shots stopped, her parents brought her back to 48th Street and Laflin Street, where police asked her to see if the guy sitting in the police car was the same guy she had seen on the bike. She recognized him although she testified he was not wearing the same clothes: instead of the jacket he was wearing earlier, he had on a sweater, and he was holding his hat in his hands.

¶ 14   O'Reilly testified that, in 1996, he was a La Raza gang member, and the La Razas were at war with the Blackstones. At around 7 p.m., O'Reilly was at 47th Street and Laflin Street, talking with friends, when he heard gunshots. He ran toward 48th Street and saw a man on a mountain bike around 50 feet away. The lighting was "pretty good." The cyclist fired a shot at O'Reilly, who ducked to the ground. When he got up, he saw the cyclist leaving, going east. Later that evening, police asked O'Reilly to look at Brown, who was sitting in the back of a squad car. They shone a flashlight into the car and asked if he could identify Brown as the shooter. O'Reilly said, "That's him." Brown was wearing a striped T-shirt when O'Reilly identified him sitting in the police car, but he was wearing a black cap and jacket at the time of the shooting.

¶ 15   Campos testified that in 1996, he was 16 years old and a La Raza gang member. At the time of trial, he had a felony conviction for aggravated unlawful use of a weapon and was in

custody for marijuana possession, but he had made no deals with the prosecution. At 6:30 p.m. on the day of the shooting, Campos was using the phone at the corner store at 48th Street and Laflin Street. A man on a mountain bike pulled up to around five feet away from him and "threw up the pitchfork," a gesture indicating his affiliation with the Folks Nation (Folks). (La Raza is part of the Folks; Blackstone is not.) Campos did not believe the cyclist was a Folks affiliate and told him so.

¶ 16    The cyclist lifted up his shirt, revealing a pistol in his waistband. Campos ducked for cover and then ran. He heard "more than five" gunshots. Minutes later, he returned to the scene and identified Brown "as the guy that was shooting at [him]." Brown was standing outside of the car, and Campos could see him clearly; he recognized Brown as the shooter based on his clothes (which he testified were the same as when he saw him earlier) and his face.

¶ 17    At around the same time as Ward stopped Brown, police stopped two other suspects in the area. Detective John Halloran stopped a black man riding a moped at 54th Street and Bishop Street but released him upon learning that the offender was not riding a motorized vehicle. Halloran testified that other officers stopped a man on a bicycle at 52nd Street and Ashland Avenue, but that man was also released.

¶ 18    After being identified by five eyewitnesses at the scene, Brown was taken to Area 1 for processing. Halloran did not conduct a lineup because the results would have been tainted by the witnesses' prior identifications. Brown's hands were not tested for gunshot residue because he had already been identified by five witnesses and because his profuse sweating and the fact that he had used his hands to remove his coat and hat in the police car might have altered the test results.

¶ 19    Scott Rochowicz, an employee at the state police crime lab, testified for the defense that he performs gunshot residue tests. In such tests, a suspect's hands are swabbed and the swabs are analyzed for the presence of antimony, barium, and lead. A positive result indicates that the suspect either fired a gun, was nearby when a shot was fired, or handled a recently fired gun. Rochowicz acknowledged that sweat could prevent gunshot residue from sticking to one's hands, as could gripping the handlebars of a bike or rubbing hands against clothes or other items.

¶ 20    Brown testified in his own defense that he did not shoot anyone. He stated that he left the house of his girlfriend Brenda Green[1] and was heading to the store at 51st Street and Laflin Street to get something to eat when police stopped him. Later that night, when he was taken to the police station, he requested that the police put him in a lineup, but his request was ignored. (Officer Kenneth Boudreau, Halloran's partner, denied hearing Brown make such a request.) At the time he was stopped by the police, he was riding a dark-colored mountain bike and was wearing a black hat, a black jacket, and a striped T-shirt. On cross-examination, Brown admitted being a member of the Blackstone gang, but he denied that the Blackstones were at war with the La Razas.

¶ 21    Finally, the defense proffered Dr. Jonathan Schooler, an expert on witness identifications and memory. In an offer of proof, Dr. Schooler stated that multiple factors present in this case could reduce the accuracy of eyewitness identifications, including "disguises" such as "the simple wearing of a hat," weapon focus ("in the presence of a weapon, witnesses' attention is devoted more to the weapon"), and lighting. Cross-racial identifications are also less accurate.

---

[1]Green is also sometimes referred to as Brenda Harris and Brenda Herron-Green.

Suggestive factors—such as, in this case, the fact that Brown's bicycle was visible to the witnesses—can increase the chance of a false identification. Finally, Dr. Schooler stated that witness confidence and accuracy are only weakly correlated and "individuals can be very confident in their identifications and nevertheless be inaccurate."

¶ 22    Following the offer of proof, the trial court barred Dr. Schooler's testimony, stating that it would not be any more helpful to the jury "than all the factors the jury will already have in their common experiences in life," plus the judge's admonishments and instructions of law on the circumstances of identification and the arguments of counsel "with respect to the particular facts as it applies to each respective witness's identification of Mr. Brown."

¶ 23    The jury found Brown guilty of the first degree murder of Enrique, and Brown was sentenced to 45 years' imprisonment. On direct appeal, Brown argued, in relevant part, that (1) the evidence was insufficient to convict him because the showup procedure was improperly suggestive and (2) the trial court abused its discretion by excluding Dr. Schooler's testimony. We rejected these arguments and affirmed. *People v. Brown*, No. 1-99-2759 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 24                              Postconviction Proceedings

¶ 25    In 2012, Brown filed the instant postconviction petition. As amended in 2016, the petition alleged Brown's actual innocence based on (1) a new eyewitness account from Claudio Martinez, (2) Campos's recantation, (3) alibi testimony from Green and Thalmus Elzy, and (4) expert opinions on gunshot residue and eyewitness identification. Alternately, Brown argued that the trial court violated his due process rights by excluding Dr. Schooler's testimony, citing our supreme court's 2016 decision in *People v. Lerma*, 2016 IL 118496 (trial court abused its discretion in denying defendant's request to allow expert testimony on the reliability of eyewitness identifications). The circuit court advanced his petition to the third stage and held an evidentiary hearing.

¶ 26    Martinez died a week prior to the hearing, so his testimony was admitted via a *pro se* affidavit that he signed in 2009. Martinez averred that on the day of the shooting, he was standing across from the 48th Street and Laflin Street corner store when a black man rode past him on a mountain bike, pulled up to the curb, and exchanged words with Campos while Campos was on the phone. Campos began to run, whereupon the cyclist pulled a gun from his waistband and fired at two Hispanic men sitting on the stoop of the corner store. The cyclist then turned toward Martinez and started firing at him. Martinez fled.

¶ 27    Martinez later returned to the scene of the shooting and saw a black man sitting in the back seat of a police car. He observed that the black man was not the person who shot at him earlier. But when he learned that Campos had identified the man as the shooter, he kept quiet, since he and Campos were both La Raza members. After many years of reflecting on his conduct, Martinez "realized that he should come forward" with this information.

¶ 28    In a 2009 affidavit, Campos averred that he falsely identified Brown at trial in exchange for having pending criminal charges against him dismissed, "even though he falsely testified at trial that there was no agreement." He claimed that he was "coached and told what to say by the State[']s Attorney and the detectives."

¶ 29    At the 2018 evidentiary hearing, Campos did not remember his trial testimony or recognize his affidavit. He testified that around 6:30 p.m. on September 30, 1996, he exited the corner

store at 48th Street and Laflin Street when a man on a bicycle shot at him. He said, "Everything happened so fast, I didn't have a chance to see his face. *** I just ran for my life, that was it." Afterwards, he returned to the scene of the shooting but did not speak to any police. He admitted testifying at Brown's trial but claimed not to recall what he said. He denied that anyone promised to dismiss the pending charges against him in exchange for his testimony.

¶ 30    At the hearing, the State examined Brown regarding Martinez's and Campos's affidavits. Brown admitted that Martinez, who was also in custody at the time, sent him ten letters, including one in which Martinez stated: "As far as J, one of my guys is going to help me prepare his affi. And I send you the copy. You can see it and you can see if any changes need to be made and correct it and send it back to me."

¶ 31    Brown also admitted receiving unsigned letters in the same handwriting as Martinez's letters. One stated:

> "He was 16 years old at the time and he was scared and didn't have his parents with him when the cops scared him and made him say that it was you who did it. Because the cops told him that if he didn't point anybody out, that they would put the case on him. So he lied on you and did what he had to in fear for his freedom. You know, something like that sounds better to where we put this s*** on some corrupt cops that made Juan point you out."

Another stated: "If you can have your people help my guy out and have your people sign that paper saying what they thought they saw wasn't so, then we can make Juan do the same." A third such letter, which bore the same date as Martinez's affidavit, stated:

> "Here is that affidavit that you needed from me. *** I sent Juan's affidavit out to him last night with instructions as to what he has to do so you should be getting Juan's affidavit soon after. *** If there's anything that you need me to change on my affidavit, just let me know. *** [I]t's pretty much accurate just how I remember it went down and Juan's affidavit is very accurate as well."

¶ 32    Brown also testified that in 1996, he lived at 49th Street and Laflin Street with Green (his girlfriend then, his wife now). On the day of the shooting, he was at home all day before leaving at around 7 p.m. He and Green left at the same time; she was going to a riverboat casino with her grandmother, while he planned to hang out at the store at 51st Street and Laflin Street. They walked down the stairs together and went their separate ways. A minute or two later, Brown was stopped by detectives before reaching the store.

¶ 33    Green corroborated Brown's version of events, testifying that she was at home with Brown until shortly after 7 p.m. They walked down the stairs together, he wished her luck at the casino, and then she got in her car while he got on his bike and headed toward 51st Street. Green also testified that she attended Brown's trial with the intention of testifying on his behalf, but the public defender did not call her to the stand because she had been sitting in the courtroom, presumably in violation of an exclusion of witnesses order.

¶ 34    Elzy testified that he and Brown grew up together. He lived at 51st Street and Laflin Street, two blocks south of Brown's house, and in 1996 he spent time with Brown "[a]lmost every day." On the day of the shooting, Brown called Elzy and suggested they meet at the corner store at 51st Street and Laflin Street. Elzy left his porch and stood in the middle of the street. He saw Brown "come off the sidewalk where [he] project[ed] his house to be and he came in the street with the bike and he proceeded to come toward me." He did not observe Brown drop

or throw anything on the ground. As Brown was biking, he was stopped by detectives who searched him, put his bicycle in the trunk of their car, and drove away with him. Elzy visited Brown at the Cook County jail and told him that he saw him get "snatched up" by the police. But Elzy never talked to any officers or lawyers prior to Brown's 1999 trial. The first time he gave an affidavit or spoke to anyone about this case was in 2016.

¶ 35    Mary Wong, an expert in trace chemistry, testified that in September 2014, she performed gunshot residue testing on the cuffs of Brown's jacket and the foldover areas of his hat and did not find any particles indicating the presence of gunshot residue. She acknowledged such particles could have been removed by sweat or by being removed from a bag or otherwise handled. She concluded that "the sample areas *** may not have been in the vicinity of a discharged firearm [or] if they were, then the particles could have been removed by activity or not detected by the procedure."

¶ 36    Dr. Brian Cutler, an expert on witness identifications, testified that memory is divided into three stages: encoding, storage, and retrieval. Accurate encoding can be diminished by several factors: (1) the witness is identifying a stranger, (2) the witness is making a cross-racial identification, (3) the witness's "exposure time" to the subject is low, (4) the witness is under stress, (5) the witness is visually or mentally distracted, (6) the subject is wearing a head covering, since a person's hair and hairline are important cues for identification, and (7) the subject is armed ("weapon focus"). Although these factors were arguably present in some or all of the witness identifications in this case, Dr. Cutler was unable to make any assumptions about the accuracy of their identifications.

¶ 37    As for memory retrieval, Dr. Cutler stated that identification procedure "matters a great deal." Showups have both pros and cons: they minimize the time between the crime and the identification, which increases witness accuracy, but they are also inherently suggestive, which decreases accuracy. Suggestiveness is a more potent factor when witness encoding is weak. Additionally, when suggestive procedures are used, there is not a strong correlation between witness confidence and accuracy.

¶ 38    Following closing arguments, the trial court denied Brown's postconviction petition. Regarding Brown's actual innocence claim, the court found that Martinez's affidavit was not credible because the evidence indicated that it was "put forth by persons in some kind of seeming deal where, well, if you say this in this case, I'll say this in some other case." The court also found Campos's recantation "is in a stark contradistinction to his testimony at trial in which he identified Mr. Brown, [and] it's in stark contradistinction to the additional evidence at trial which showed that he identified Mr. Brown on the day of the murder at the time the murder took place."

¶ 39    The court also considered the fact that "four other persons *** right after the time of this murder identified Mr. Brown *** in properly conducted and *** independent showups not conducted within one another's presence." Thus, the court concluded that Brown's newly discovered evidence was not so substantial that it would likely change the result on retrial.

¶ 40    The court additionally rejected Brown's due process claim, stating that *Lerma*, 2016 IL 118496, did not establish a bright-line rule requiring admission of expert testimony regarding eyewitness identifications but left its admission to the discretion of the trial court.

¶ 42    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)) enables criminal defendants to challenge their convictions on constitutional or actual innocence grounds. *People v. Domagala*, 2013 IL 113688, ¶ 32; *People v. Coleman*, 2013 IL 113307, ¶ 94. A postconviction action is a collateral proceeding allowing inquiry into issues that were not, and could not have been, adjudicated on direct appeal. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). Accordingly, *res judicata* bars consideration of issues decided on direct appeal, and waiver bars consideration of issues that could have been presented on direct appeal but were not. *Id.*

¶ 43    Brown's petition was denied at the third stage of postconviction proceedings, where "the burden of proof is upon the petitioner to show a denial of [a] constitutional right by a preponderance of the evidence." (Internal quotation marks omitted.) *Coleman*, 2013 IL 113307, ¶ 92. At a third-stage evidentiary hearing, the circuit court serves as the finder of fact; thus, it is the court's function to determine witness credibility, decide the weight to give to evidence, and resolve evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 44    Here, Brown argues that the trial court erred in rejecting both his due process claim and his actual innocence claim. We consider these contentions in turn.

¶ 45                                                    Due Process

¶ 46    Brown first argues that, based on our supreme court's 2016 decision in *Lerma*, 2016 IL 118496, his due process rights were violated when the trial court barred Dr. Schooler from testifying as an expert on eyewitness identifications.

¶ 47    In *Lerma*, the evidence of defendant's guilt consisted solely of two eyewitness identifications, "only one [of which] was subject to adversarial testing and cross-examination at trial." *Id.* ¶ 26. The victim, Gill, and his friend, Clark, were sitting on Gill's porch when a gunman approached and opened fire, hitting Gill several times. Gill told Clark that the shooter was the defendant, whom Gill had been friends with for years. Although Gill died before trial, his statement was admitted into evidence as an excited utterance. As for Clark, she went to the police station the next day and identified defendant as the shooter from an array of six photos. She later also identified defendant in a one-man showup. Regarding her familiarity with the defendant, Clark testified that she had seen him across the street around 10 times, but she admitted that she " 'did not know him.' " *Id.* ¶ 6.

¶ 48    Under these facts, our supreme court held that the trial court abused its discretion in denying defendant's motion to call an expert to testify on the reliability of eyewitness identifications. *Id.* ¶ 32. The court began its analysis by noting that "[a] criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf." *Id.* ¶ 23. The court further observed that the past 25 years "have seen a dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted." *Id.* ¶ 24. There is now "a clear trend" toward admission of such testimony at the trial court's discretion for two reasons: first, advances in DNA testing have confirmed that eyewitness misidentifications are " 'responsible for more wrongful convictions than all other causes combined' " and, second, the expert testimony at issue is both unfamiliar and counterintuitive to the average person. *Id.* (quoting *State v. Dubose*, 2005 WI 126, ¶ 30, 699 N.W.2d 582

(collecting relevant studies)). *Lerma* therefore concluded that research concerning eyewitness identifications "is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.*

¶ 49    In *Lerma*, the court discussed four factors that courts should consider in assessing the relevance and appropriateness of expert testimony on eyewitness identifications: (1) the importance of the eyewitness identifications to the State's case, (2) the presence or absence of the factors identified by the expert as undermining the credibility of witness identifications, (3) whether the witness was subject to adversarial testing and cross-examination at trial, and (4) the witnesses' prior familiarity with the defendant. *Id.* ¶ 26.

¶ 50    As in *Lerma*, the State's eyewitness identifications were the sole evidence of Brown's guilt in this case. All of the identifications were cross-racial, all were identifications by strangers, and the shooter was wearing a hat, which diminishes the accuracy of facial encoding. Three of the State's witnesses—Leodegareo, O'Reilly, and Campos—had only a brief opportunity to view the shooter before he began firing at them, and their encoding may have been impaired by both stress and weapon focus. In addition, all of the identifications were made outside after nightfall at a single-person showup, an inherently suggestive procedure.

¶ 51    Nevertheless, Brown cannot avail himself of the *Lerma* decision on collateral review. As discussed, in postconviction proceedings, *res judicata* bars consideration of issues decided on direct appeal. *Coleman*, 206 Ill. 2d at 277. Here, Brown argued unsuccessfully on direct appeal that the trial court erred in barring Dr. Schooler's testimony. *Brown*, No. 1-99-2759. The court specifically held as follows:

> "The trial judge considered the proffered testimony of Dr. Schooler, balanced the testimony against cases in which the court has upheld the exclusion of such evidence, and found that the testimony would be no more helpful than the factors that the jury would already have in the jury instructions on the reliability of eyewitness identification, and in their common life experience and knowledge. [Citations.] Additionally, defense counsel had ample opportunity to cross-examine the witnesses regarding their identifications." *Id.*

¶ 52    Brown argues that *res judicata* does not preclude reexamination of the issue since *Lerma* changed the relevant law. See, *e.g.*, *People v. Partee*, 268 Ill. App. 3d 857, 863-64 (1994). But it was well established prior to *Lerma* that the trial court, in the exercise of its broad discretion, must "carefully scrutinize" the relevance and probative value of the defense's proffered eyewitness identification expert testimony. (Internal quotation marks omitted.) *People v. Allen*, 376 Ill. App. 3d 511, 526 (2007) (trial court committed reversible error by failing to conduct meaningful inquiry into the relevance and probative value of eyewitness identification expert's testimony); see also *People v. Starks*, 2014 IL App (1st) 121169, ¶ 72 (on remand, directing trial court to give "serious consideration" to defendant's request to present expert testimony on eyewitness identification). *Lerma* did not change this standard; on the contrary, it reaffirmed the longstanding rule that admission of expert testimony is within the trial court's discretion and shall not be overturned on review absent an abuse of that discretion. *Lerma*, 2016 IL 118496, ¶¶ 23, 32.

¶ 53    Moreover, even assuming *arguendo* that *Lerma* represents a significant enough change in the law to overcome *res judicata*, its application would in that case be barred by *Teague v. Lane*, 489 U.S. 288, 301 (1989), which limits application of "new rules" in postconviction proceedings. See *People v. Sanders*, 238 Ill. 2d 391, 400-01 (2010) (discussing *Teague*). A

"new rule" may only be applied retroactively if (1) it is a substantive rule, *e.g.*, one which narrows the scope of a criminal statute or places certain conduct or individuals beyond the State's power to punish, or (2) it is a "watershed" procedural rule, meaning that the rule "is implicit in the concept of ordered liberty, without which the likelihood of an accurate conviction is seriously diminished." *People v. Davis*, 2014 IL 115595, ¶ 36. Here, *Lerma* is clearly not a substantive rule, and Brown does not argue that it is a watershed procedural rule. See *People v. Morris*, 236 Ill. 2d 345, 361 (2010) (observing that "since *Teague*, the United States Supreme Court has rejected every claim brought before it alleging that a new rule satisfies the requirements for watershed status"). Accordingly, the trial court did not err in denying his due process claim.

¶ 54                                    Actual Innocence

¶ 55      Next, Brown contends that the trial court erred in denying his claim of actual innocence. To prevail on such a claim, "the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). As our supreme court explained in *Coleman*:

> "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.*

See also *People v. Robinson*, 2020 IL 123849, ¶¶ 55-56 (evidence is material to an actual innocence claim if it tends to significantly advance that claim and "need not be entirely dispositive to be likely to alter the result on retrial").

¶ 56      Insofar as the trial court bases its decision on credibility determinations or findings of fact, we review its decision for manifest error, which occurs only where the opposite conclusion is plainly evident. *Coleman*, 2013 IL 113307, ¶ 98. But when the trial court rules on a question of law, our review is *de novo*. *Sanders*, 238 Ill. 2d at 398.

¶ 57      We first consider Brown's alibi witnesses, Green and Elzy. The State argues that neither of these witnesses is "new" because Brown was aware of his own whereabouts and could therefore have produced Green and Elzy at trial with due diligence. See *People v. Harris*, 206 Ill. 2d 293, 301 (2002) (affidavits of alibi witnesses were not "newly discovered" because defendant "was armed with this information at the time of trial").

¶ 58      With regard to Elzy, we agree. According to Elzy's testimony, Brown called him and suggested they meet at the 51st Street and Laflin Street store. Elzy saw Brown biking toward the store and believed Brown saw him as well. Moreover, after Brown's arrest, Elzy visited him in jail and said that he saw him "get snatched up" by the police. In light of these facts, it is clear that Brown was aware of Elzy's potential testimony prior to trial.

¶ 59      Similarly, if Brown was at home with Green when the shooting occurred and then left the house together with her, he obviously would have been aware of those facts before trial. Brown nevertheless argues that Green is a "new" witness because she was unavailable at trial. It is undisputed that Green was willing to testify on Brown's behalf, and in fact came to court for

that purpose, but was told by the public defender "that [she] wasn't able to [testify] because [she] was in the courtroom."

¶ 60    The State argues that a witness's unavailability at trial does not render her testimony "new" for purposes of an actual innocence claim. See, *e.g.*, *People v. Jarrett*, 399 Ill. App. 3d 715, 723 (2010) ("evidence is not 'newly discovered' when it presents facts already known to a defendant at or prior to trial, even if the source of these facts may have been unknown, unavailable, or uncooperative"). But this proposition has been significantly called into doubt by our supreme court's decision in *People v. Edwards*, 2012 IL 111711. In *Edwards*, defendant was convicted of murder. He later filed successive postconviction petitions alleging actual innocence on the basis of (1) an affidavit from his codefendant Eddie stating that defendant " 'had nothing to do with this shooting' " and (2) affidavits from two alibi witnesses. *Id.* ¶¶ 10, 12.

¶ 61    The *Edwards* court found that the codefendant's affidavit constituted newly discovered evidence, stating:

> "While petitioner obviously knew of Eddie at the time of trial, the evidence in Eddie's affidavit apparently was nevertheless unavailable at trial [citation], and the evidence thus qualified as newly discovered. Eddie was a codefendant, with a fifth amendment right to avoid self-incrimination. No amount of diligence could have forced him to violate that right if he did not choose to do so." (Internal quotation marks omitted.) *Id.* ¶ 38.

See also *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) (holding that "[t]he testimony of Molstad's codefendants clearly qualifies as newly discovered evidence" because no amount of diligence could have compelled them to incriminate themselves at trial).

¶ 62    The *Edwards* defendant also argued that his alibi witnesses were unavailable, and therefore "new," because they refused to testify on his behalf at trial. *Edwards*, 2012 IL 111711, ¶ 35. In response, our supreme court stated: "We do not conclude that such evidence could never be considered unavailable where, as here, the witnesses rejected the petitioner's attempts to persuade them to testify." *Id.* ¶ 37. Thus, the court appeared to contemplate that an alibi witness who is genuinely unavailable at trial may be considered new for actual innocence purposes. However, the court found that the defendant failed to satisfy the due diligence requirement because he made no attempt to subpoena the witnesses. *Id.*

¶ 63    Here, Brown asserts that Green's testimony was unavailable because "the court barred her from testifying for violating the witness sequestration rule." This is not supported by the record. Green did not state that the court barred her from testifying, merely that Brown's counsel did not call her due to her presence in the courtroom. Likewise, the trial transcript does not reflect that the trial court issued an order barring her from testifying. After Dr. Schooler's testimony was barred, the defense stated that it would call "[t]hree [witnesses] at the most"; then it called two witnesses (Brown and a gunshot residue expert) and rested. The defense did not mention Green, much less move for admission of her testimony.

¶ 64    "A violation of a court order excluding witnesses or prohibiting witnesses from discussing their testimony does not result in the automatic exclusion of a witness's testimony." *In re H.S.H.*, 322 Ill. App. 3d 892, 896 (2001). Rather, the trial court retains discretion to allow such a witness to testify. *Id.*; see, *e.g.*, *People v. Trask*, 167 Ill. App. 3d 694, 706 (1988) (trial court did not abuse its discretion in permitting witness to testify after he reviewed the transcript of another witness's testimony in violation of court order). Denying a party's motion to admit a

witness who has violated an exclusion order constitutes an abuse of discretion if (1) the testimony would have been material and (2) the rule violation was not the party's fault. *H.S.H.*, 322 Ill. App. 3d at 896-97.

¶ 65    In light of this well-established law, and in the absence of any evidence that Brown moved to admit Green's testimony or was barred from calling her, we find that Brown has not satisfied the due diligence requirement. Green's testimony at trial could have been procured through the exercise of due diligence, and it is therefore not newly discovered.

¶ 66    We next consider Martinez's affidavit and Campos's recantation affidavit and testimony. Although Martinez's affidavit was new, material, and noncumulative, the circuit court found that it was not credible based on letters sent from Martinez to Brown indicating that Martinez's affidavit was part of a deal "where, well, if you say this in this case, I'll say this in some other case" (in the words of the circuit court). We find this conclusion to be amply supported by the record. In one letter, Martinez wrote: "If you can have your people help my guy out and have your people sign that paper saying what they thought they saw wasn't so, then we can make Juan [Campos] do the same."[2] In another letter, he told Brown that he was going to prepare Campos's affidavit with help from "one of [his] guys."

¶ 67    As for Campos, the circuit court also did not give much weight to his recantation, stating: "He didn't really testify to much. *** [H]e testified that he didn't have any recollection of that day at all." Brown correctly points out that Campos also testified that he did recall the day of the shooting and, specifically, he recalled that things happened too quickly for him to see the shooter's face.

¶ 68    Nevertheless, there are multiple reasons that a finder of fact might choose not to credit Campos's recantation. First, "[i]t is well settled that the recantation of testimony is generally regarded as unreliable." *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Second, as noted, the evidence showed that Martinez wrote his affidavit as part of a deal with Brown's "people." That same evidence indicated that Martinez prepared Campos's affidavit for him. In fact, Campos testified at the evidentiary hearing that he did not recognize that affidavit. Additionally, Campos's testimony was not strictly exonerating; he said that he "didn't have a chance to see [the shooter's] face," so he could not say whether Brown was the shooter and did not purport to contradict the State's other eyewitnesses in that regard.

¶ 69    Finally, we consider Brown's expert testimony. Wong's testimony that gunshot residue testing on Brown's jacket and hat came back negative is clearly new, material, and noncumulative. But as Wong acknowledged on the stand, her findings are far from conclusive since it is possible that Brown fired a gun without depositing residue on his clothes or that residue was removed by handling of Brown's clothes in the years before she performed the test.

¶ 70    As for Dr. Cutler's testimony, although it serves to undermine the credibility of the State's witnesses, it does not exonerate Brown by affirmatively demonstrating that he was not the shooter. In the context of an actual innocence claim, "[e]vidence that merely impeaches a witness will typically not be of such conclusive character as to justify postconviction relief." *People v. Collier*, 387 Ill. App. 3d 630, 637-38 (2008) (rejecting actual innocence claim

---

[2]This letter was not signed, but Brown acknowledged it was in the same handwriting as other letters sent by Martinez.

because "defendant has repackaged the reasonable doubt arguments advanced at trial, on direct appeal, and collateral review and placed them upon the altar of actual innocence").

¶ 71        Considering the evidence as a whole, we do not find it "so conclusive it would probably change the result on retrial" (*Coleman*, 2013 IL 113307, ¶ 96). Neither Elzy's testimony nor Green's testimony qualifies as new. Martinez's affidavit and Campos's recantation are new, material, and noncumulative but heavily impeached by correspondence implying they were procured as part of a deal. Dr. Cutler's testimony serves only to impeach the State's evidence, and Wong's findings are inconclusive.

¶ 72        Accordingly, we do not find that Brown has met the criteria to warrant a new trial based on his actual innocence claim. See *Washington*, 171 Ill. 2d at 489 (describing the requirement of conclusive evidence as the "most important[ ]" element of an actual innocence claim).

¶ 73                                        CONCLUSION

¶ 74        For the foregoing reasons, we affirm the judgment of the circuit court denying Brown's petition for postconviction relief.

¶ 75        Affirmed.