2024 IL App (1st) 210496-U

No. 1-21-0496

Order filed January 22, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 21872 |
| | ) | |
| JAVARRO SMITH, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Reversing the circuit court's second-stage dismissal of defendant's postconviction petition where defendant made a substantial showing that he was actually innocent based on a newly discovered affidavit that an eyewitness observed a different person commit the murder for which defendant was convicted.

¶ 2    Defendant Javarro Smith appeals from the circuit court's second-stage dismissal of his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). He argues that the court erred in dismissing his petition because he made a

substantial showing of actual innocence based on newly discovered evidence. For the following reasons, we reverse and remand for third-stage proceedings under the Act.

¶ 3    Following a 2008 jury trial, defendant was found guilty of the first degree murder of Lance Watters and sentenced to 58 years' imprisonment.[1]

¶ 4    At trial, Quenton Davis testified that he had several drug convictions. He was a former member of the southside Black P Stones (BPS) gang. Watters was a member of the Four-Corner Hustlers, a faction of the Vice Lords gang. In October 2005, BPS and the Vice Lords were "at war." However, Davis and Watters were friends. Defendant, whom Davis had known for about 10 years, was a member of the northside BPS.

¶ 5    Around 2:30 a.m. on October 2, 2005, Davis was with Watters, Watters's girlfriend, and a man named "Bishop" in front of 5411 N. Winthrop Avenue, in Chicago. That address was a "weed spot." Davis was counting money and rolling a marijuana cigarette when he heard Watters say, "who the **** is this, Joe?" Davis looked up and saw a person wearing black clothes and a dark brown hooded sweatshirt or coat approaching the group from the south. The person's hood was up. From about eight feet away, Davis saw the person's face and recognized him as defendant. There were lights on the building, so the lighting was "fair," and the lights shined "so bright" on defendant. Davis saw defendant's face for three or four seconds. Defendant pulled the strings of his hood to draw it closed, drew a handgun from behind him, extended it, and fired one shot at Watters. He then walked south on Winthrop and turned the corner to Balmoral Avenue, the way

---

[1] In our order on defendant's direct appeal (*People v. Smith*, No. 1-09-0482 (2011) (unpublished order under Illinois Supreme Court Rule 23)), we spelled the victim's surname as "Waters." However, we note that the victim's sister testified at defendant's sentencing hearing and spelled her surname as "Watters," the spelling we adopt in this order.

he had come. Davis began to run and then returned to Watters, who had died. Davis left when the police arrived. Later that day, police showed Davis a photo array and he identified defendant as the shooter. In August 2006, he viewed a lineup and again identified defendant as the shooter.

¶ 6    Davis acknowledged that, since 6:30 p.m. on the evening of the shooting, he had been drinking two fifths of brandy and smoked approximately one gram of marijuana. He denied being drunk or high at the time of the shooting.

¶ 7    Dennis Pedretti testified that he was working as a security guard near 5411 N. Winthrop when the shooting occurred. He was in his car and observed three men and a woman in front of the building. It was very well-lit but there were no lights on the outside of the building. Another man walked past Pedretti's car, 10 or 20 feet away from Pedretti. The man came from Balmoral, headed north on Winthrop. He wore a black hoodie with the hood up. Pedretti saw a "little bit" of the man's face but could tell only that he was dark-skinned and could not tell the shape of the man's nose or cheek bones, whether his eyes were set closely or far from each other, or whether he had facial hair. The man approached one of the men in front of 5411 N. Winthrop, drew a black semi-automatic pistol, and shot him. The shooter then walked south past Pedretti's car towards Balmoral. Pedretti saw that the shooter was smiling.

¶ 8    Kekoa Christian testified that he was with defendant and William Shelton during the early morning on October 2, 2005. Christian denied seeing defendant with a weapon or hearing him discuss a shooting. Christian admitted giving a written statement to the police and testifying before the grand jury but denied making certain statements.

¶ 9    An assistant state's attorney (ASA) testified that she took a written statement from Christian. According to the statement, in the early hours of October 2, 2005, Christian was with

Shelton near Balmoral when defendant, wearing a black hoodie with the hood up, ran to them from Winthrop. The three then drove in Shelton's vehicle to Nikki Shelby's house. On the way, defendant played with a .45-caliber handgun. While at Shelby's house, defendant demonstrated how he approached a Vice Lord and shot him in the chest. Another ASA testified to the contents of Christian's grand jury testimony, which was consistent with his written statement.

¶ 10   Shelton testified that he saw defendant and Christian the morning of October 2, 2005, but did not remember the shooting. He went to Shelby's house and he gave her a bag of t-shirts.

¶ 11   Shelton admitted that, in a written statement and before the grand jury, he stated that he, defendant, and Christian were in his vehicle in the early morning of October 2, 2005. Defendant indicated he needed to hide a gun and exited Shelton's vehicle at Balmoral and Kenmore Avenues. Shelton then heard a gunshot. A few seconds later, defendant returned and Shelton drove to Shelby's house and handed her the gun wrapped in something. The next morning, defendant called Shelton and said that someone named Lance had been killed on Winthrop. That evening, Shelton was with defendant, who said he had shot a rival gang member in the neck with the gun Shelton had given Shelby. Defendant explained that he and the victim approached each other, the victim said, "what's up, Joe," and defendant shot him. Defendant further stated that he believed a person called "Q," who was with BPS, had seen his face.

¶ 12   At trial, Shelton denied that defendant confessed to the shooting or had a .45-caliber gun on October 2, 2005. Shelton had told the police that because they gave him a deal on a drug case. He was high on cocaine when he gave the written statement and, if he was not high during his grand jury testimony, he was "probably coming down."

¶ 13　　Shelby testified that defendant, Shelton, and Christian had been members of the same BPS faction. In the early morning on October 2, 2005, Shelton drove to her home. Other people were in Shelton's vehicle but Shelby could not see who they were. Shelton gave Shelby a plastic bag and returned to retrieve it later that night. Shelton acknowledged that, in a written statement and grand jury testimony, she stated she left in Shelton's vehicle with him, defendant, and Christian. She further acknowledged she stated she and Shelton dropped off defendant and Christian, and the next day she returned the bag to Shelton.

¶ 14　　Richard Landgraff, a detective, testified that he recovered a .45-caliber cartridge case at the scene of the shooting. There were no lights on the outside of 5411 N. Winthrop but there were "[h]igh intensity" streetlights. The parties stipulated that a doctor would testify that Watters died of a single gunshot wound to the chest.

¶ 15　　The jury found defendant guilty and the court sentenced him to 58 years' imprisonment. We affirmed on direct appeal. *People v. Smith*, No. 1-09-0482 (unpublished order under Illinois Supreme Court Rule 23).

¶ 16　　In April 2013, defendant filed an initial petition for relief under the Act. The circuit court dismissed his petition at the first stage and we affirmed. *People v. Smith*, No. 1-13-2460 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 17　　On December 2, 2015, defendant filed the *pro se* motion for leave to file a successive petition under the Act, and successive petition, at issue in this appeal. He raised a claim of actual innocence based on newly discovered evidence, including affidavits from Roderick Doxy and France Whitten, whom he had discovered in 2015. He attached the affidavits to his petition.

¶ 18     In his affidavit, dated June 2, 2015, Doxy averred that he had been in a gang that was at war with BPS. The day prior to Watters's shooting, he observed Watters shoot twice at a vehicle associated with several BPS members, including a man named Raymond "aka Raystone," while Raystone was about to enter the vehicle. Then, around 2:30 a.m. on October 2, 2005, Doxy called Watters to purchase marijuana from him. Watters told Doxy to walk to a white building on Balmoral and Winthrop.

¶ 19     As Doxy approached the building, he observed Watters, Watters's girlfriend, and two other men near the building. Raystone then turned the corner from Balmoral. He wore a black hoodie and blue jeans, and Doxy observed him raise his hood. Watters walked towards Raystone. When they were a few feet apart and Doxy was "about to cross the street" towards them, Raystone raised a black handgun in his right hand and fired a single shot at Watters. Doxy turned and ran.

¶ 20     Later that evening, Doxy told his "Five Star Universal Elite" what he had seen. Doxy was ordered to remain silent as the Vice Lords would "deal with it." He feared the gang would harm him or his family if he disobeyed, so he told no one what he had witnessed. However, a few months prior to his affidavit, he encountered defendant in prison. He learned defendant was imprisoned for Watters's murder and told defendant that he had seen Raystone shoot Watters. Doxy stated he was now coming forward because he knew defendant had nothing to do with Watters's death.

¶ 21     Whitten averred in his affidavit, dated September 24, 2015, that on October 1, 2005, defendant instructed him to "violate" Davis—*i.e.*, take Davis's money and drugs—for disobeying defendant's instructions not to sell drugs in a certain neighborhood.[2] Whitten and two others

---

[2] In the affidavit, Whitten refers to the person whom defendant ordered him to violate as "Quentin 'Q-Stone' Doe." However, both parties assume that he was referring to Davis.

approached Davis and the others "violated" him. Davis yelled that he knew they were acting on defendant's orders and would not "let this slide." Then, in February 2008, Whitten encountered Davis, who stated that he had lied about defendant killing Davis's friend Lance. Davis described the shooting to Whitten but stated he was drunk and high.

¶ 22    Davis told Whitten that on the evening after the shooting the police showed him a photo array. They told Davis that, if he did not select one of the photos, he would be charged with his friend's murder, as he had left the scene and the police knew his and Watters's gangs were at war. Davis lied that defendant was the shooter because defendant had ordered Whitten and the others to violate Davis the previous day. Davis later identified defendant in a lineup and planned to testify against him because the police stated that, if he did not, defendant would be released and Davis feared defendant.

¶ 23    Defendant also attached a September 25, 2015, affidavit from Shantal Beasley in which Beasley averred that she witnessed the shooting from the corner of Balmoral and Winthrop and the shooter was "Raymond 'Ray' Smith," who had since died. In an affidavit of his own, dated November 19, 2015, defendant averred that he discovered Doxy's exculpatory evidence in prison in 2015. He further averred that he did not shoot or kill Watters and was not involved in his death in any way.

¶ 24    The circuit court docketed defendant's petition for second stage proceedings under the Act and appointed counsel. Counsel filed an amended petition raising an actual innocence claim based on Doxy and Whitten's affidavits, which counsel attached. Counsel asserted that the police had not interviewed Doxy or Whitten and their names were absent from the police reports. Trial counsel therefore had not been alerted to their value as witnesses. Counsel further adopted the

portions of defendant's *pro se* motion and successive petition asserting that defendant did not learn of the witnesses until 2015, after his trial and direct appeal. Counsel did not discuss or attach Beasley's affidavit.

¶ 25    The State filed a motion to dismiss the amended petition. The State argued that Whitten's affidavit could not support a postconviction claim as it was based on hearsay and was not newly discovered evidence as defendant knew that Davis had a motive to implicate him in Watters's murder as defendant had ordered the attack on Davis the previous day. The State further argued that Doxy's affidavit only presented a challenge to the sufficiency of the evidence, not a claim of actual innocence, as it contradicted the trial testimony but was not sufficiently conclusive to warrant a different outcome.

¶ 26    On April 8, 2021, following argument, the court found that Whitten's affidavit could not be considered newly discovered as defendant would have known about Davis's bias prior to trial. The court noted that Whitten's affidavit contained hearsay and double hearsay evidence, which although "allowed for a third stage hearing" could be afforded its "proper weight." The court continued that it did not find the hearsay evidence "reliable" and "wouldn't be able to give it much weight, if any." The court clarified that it was only commenting on the "reliability" of Whitten's information and not improperly commenting on its "credibility."

¶ 27    The court then turned to Doxy's affidavit. The court acknowledged that Doxy, in his affidavit, identified Raystone as the shooter and averred that, on the day before Watters was killed, he saw Watters shoot at Raystone's vehicle.[3] The court stated that, "basically," defendant had

---

[3] The transcript indicates that, while the court discussed Doxy's affidavit, the internet connection was lost and the court reporter could not take down some of the court's statements. However, the State filed

presented one eyewitness, which "does not compare to the State's case." The court thus concluded that Doxy and Whitten's testimony would not probably change the outcome on retrial and defendant therefore failed to meet his burden at the second stage of proceedings under the Act. The court repeated that it was "not making any credibility determinations" but "simply comparing the evidence." The court granted the State's motion and dismissed defendant's petition.

¶ 28   On appeal, defendant argues that the circuit court erred in granting the State's motion and dismissing his petition. He asserts that Doxy's affidavit is newly discovered evidence that, when taken as true, is material and noncumulative evidence that places the trial evidence in a different light and undermines confidence in the jury's verdict. He further asserts that Whitten's affidavit impeaches Davis's credibility and would corroborate his defense. Thus, he requests that we reverse the circuit court's judgment and remand for third-stage proceedings under the Act.

¶ 29   The Act "provides a criminal defendant the means to redress substantial violations of his constitutional rights in his original trial or sentencing." *People v. Allen*, 2015 IL 113135, ¶ 20. The Act only contemplates the filing of one postconviction petition. *People v. Robinson*, 2020 IL 123849, ¶ 42. However, the bar against successive petitions is relaxed where the petitioner asserts a fundamental miscarriage of justice based on actual innocence. *Id.* The evidence of actual innocence must be newly discovered, not discoverable earlier through the exercise of due diligence, material and noncumulative, and of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶ 24. If the circuit court

_____

on appeal an agreed statement of facts, signed by defendant's postconviction counsel and the ASA present at the hearing, that sets forth the entirety of the court's statements.

grants a petitioner leave to file a successive petition, the petition is docketed for the second of the Act's three stages. *Robinson*, 2020 IL 123849, ¶ 43; *Allen*, 2015 IL 113135, ¶ 21.

¶ 30    At the second stage of proceedings under the Act, the court may appoint the defendant counsel, who may file an amended petition, and the State must either answer or move to dismiss the petition. *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 64 (citing 725 ILCS 5/122-4, 122-5 (West 2018)). The circuit court must take as true all well-pleaded factual allegations unless they are positively rebutted by the trial record. *Sanders*, 2016 IL 118123, ¶¶ 37, 48. To survive to the third stage, the defendant must make a substantial showing that the evidence supporting his claim is newly discovered, material and noncumulative, and of such conclusive character that it would probably change the result on retrial. *Id.*, ¶¶ 37, 46. The court may not determine the credibility or reliability of the evidence until a third-stage evidentiary hearing. *Robinson*, 2020 IL 123849, ¶ 61. We review second stage dismissals *de novo*. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 31    We first consider Whitten's affidavit. As the circuit court pointed out, defendant would have known about the information regarding defendant's ordering Whitten and others to "violate" Davis. Thus, it cannot be considered newly discovered evidence. See *People v. Lenoir*, 2021 IL App (1st) 180269, ¶ 36 (information in an affidavit that was known to defendant before trial is not newly discovered) (citing *Robinson*, 2020 IL 123849, ¶ 53)). However, as to Whitten's averments about Davis's 2008 statements, they were admissible and to be taken as true at the second stage despite their basis in hearsay and double hearsay. See *Robinson*, 2020 IL 123849, ¶ 78 (rejecting argument that hearsay cannot support a claim of actual innocence as the rules of evidence do not apply to postconviction hearings (citing Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019))).

¶ 32 Nevertheless, Whitten's testimony would serve only to impeach Davis's credibility. Impeachment evidence is not of sufficiently conclusive character to justify postconviction relief. *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49; see also *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997) (evidence which only discredits, contradicts, or impeaches a witness does not support granting new trial). Whitten's affidavit therefore does not support defendant's claim. See *Robinson*, 2020 IL 123849, ¶ 47 (to establish claim of actual innocence, newly discovered evidence must be of such conclusive character that it would probably change the result on retrial).

¶ 33 However, we find that, regarding Doxy's affidavit, defendant has met his burden at the second stage. First, the State does not dispute, and we agree with defendant, that defendant has made a substantial showing that Doxy's affidavit is newly discovered, material, and noncumulative.

¶ 34 Doxy averred that he saw Raystone shoot Watters but did not tell anyone as he feared disobeying orders from a superior in his gang. He did not encounter defendant in prison until years later, only a few months before completing his June 2, 2015, affidavit. He learned from defendant that defendant had been imprisoned for Watters's murder and told defendant that he had seen Raystone shoot Watters. Defendant stated in his affidavit and *pro se* motion for leave to file the successive petition, which counsel adopted in the amended petition, that he discovered Doxy's exculpatory evidence in prison in 2015. Thus Doxy's information was newly discovered long after the 2008 trial and 2013 filing of the initial postconviction petition. Further, as there was no evidence presented at trial concerning Raystone or the identity of another possible shooter, testimony that a witness observed another person shoot Watters is noncumulative and material to defendant's guilt or innocence.

¶ 35    Defendant has also made a substantial showing that Doxy's affidavit is of such conclusive character that it would probably change the result on retrial, the most important element of an actual innocence claim. *Sanders*, 2016 IL 118123, ¶ 47.

¶ 36    Doxy averred that, the day before Watters was killed, he observed Watters fire at a BPS vehicle that Raystone was about to enter. Then, around 2:30 a.m. on October 2, 2005, he called Watters to buy marijuana. Watters told him to walk to a white building on Balmoral and Winthrop. As Doxy approached the building, Watters approached Raystone, who had turned the corner from Kenmore. Raystone wore a black hoodie and blue jeans. He pulled the hood over his head. As Doxy "was about to cross the street," Raystone raised a black handgun in his right hand and shot Watters once from a few feet away.

¶ 37    The State argues that Doxy's affidavit is insufficiently conclusive given the strength of the trial evidence against defendant. The State notes that Davis testified he had known defendant for about 10 years and saw defendant's face from about eight feet away as defendant shot Watters. The State introduced evidence that Christian and Shelton were with defendant around the time of the murder. According to Christian and Shelton's statements and grand jury testimony, defendant stated he needed to hide a gun and exited Shelton's car near the scene of the murder. Shelton heard a single gunshot. Defendant reentered Shelton's vehicle a few seconds later and they drove to Shelby's house. Defendant played with a .45-caliber handgun during the drive. When they arrived, Shelton handed Shelby the gun and defendant demonstrated how he shot a Vice Lord in the chest. The next day, defendant stated that he shot a rival gang member in the neck and believed a BPS member called "Q" had seen his face. A police detective discovered a .45-caliber shell casing at

the scene of the murder. According to the State, the circuit court correctly considered that evidence and determined that Doxy's affidavit would not change the result on retrial.

¶ 38 We disagree. To be sufficiently conclusive, new evidence must place the trial evidence in a different light and undermine the court's confidence in the guilty judgment. *Robinson*, 2020 IL 123849, ¶ 48. The new evidence need not be entirely dispositive. *Id.* Rather, when taken as true, it must "raise the probability that it is more likely than not that no reasonable juror would have convicted [the defendant]." *Id.* ¶ 61. We stress that taking an affidavit as true means "that a juror, hearing from [the new witness] at a hypothetical retrial, would *believe* his testimony." (Emphasis and alteration in original and internal quotation marks omitted.) *Wilson*, 2022 IL App (1st) 192048, ¶ 75.

¶ 39 As to the trial evidence, neither Christian nor Shelton witnessed the shooting and both recanted their statements inculpating defendant. The only eyewitnesses were Pedretti, who did not identify the shooter, and Davis. Since 6:30 p.m., approximately eight hours before the shooting, Davis had been drinking two fifths of brandy and smoked approximately one gram of marijuana. He was counting money and rolling a marijuana cigarette when the shooting occurred. He had multiple convictions and was in a different BPS faction than defendant. The firearm used in the shooting was never recovered, and no forensic evidence placed defendant at the scene. Doxy's description of the shooter's clothing, the direction from which the shooter walked, and the circumstances of the shooting are consistent with Davis and Pedretti's testimonies.

¶ 40 Given the above, finding defendant guilty would require concluding that Doxy was incredible or, at least, that his eyewitness testimony was outweighed by the remaining evidence. The circuit court could not make those determinations at the second stage. See *People v.*

*Domagala*, 2013 IL 113688, ¶¶ 34-35 (issues of witness credibility, the weight to be given evidence, and evidentiary conflicts are to be resolved at third stage, not second stage). Thus, as we must assume that a jury would believe Doxy's testimony (*Wilson*, 2022 IL App (1st) 192048, ¶ 75), we find his testimony raises a probability that the jury would not have found defendant guilty. Accordingly, it is of sufficiently conclusive character to support defendant's claim.

¶ 41    In reaching this conclusion, we are not persuaded by the State's reliance on *People v. Jones*, 2017 IL App (1st) 123371, in arguing that Doxy's affidavit is not sufficiently conclusive. There, the trial evidence, including the defendant's confession, established that he and two cooffenders shot the victim. *Id*. ¶¶ 10-17. The defendant later filed a successive postconviction petition raising a claim of actual innocence based on an eyewitness's affidavit averring that he observed one of the cooffenders commit the shooting alone. *Id.* ¶¶ 31-33. On appeal from the circuit court's denial of leave to file the petition, we found that the affidavit was insufficiently conclusive as it did not rule out that the defendant was present during the shooting, given the affiant's "distant" and potentially obscured view of the crime scene. *Id.* ¶¶ 46-52. Moreover, the physical evidence established that there were multiple shooters and firearms used in the shooting. *Id.* ¶¶ 53-55.

¶ 42    Here, unlike in *Jones*, it is undisputed that there was only one offender, not multiple offenders, one or more of whom Doxy may not have observed. *Cf. id.* ¶ 50 (noting that affidavit did not establish the defendant's absence from the scene of the offense and citing *People v. Edwards*, 2012 IL 111711, ¶ 39, where affidavit did not exonerate the defendant from being guilty under accountability theory).

¶ 43    Further, nothing in Doxy's affidavit or the record indicates that Doxy's view of the shooting was limited or obstructed. Doxy indicated that he observed Watters, Watters's girlfriend,

and two other individuals near the shooting, and Davis and Pedretti likewise testified that there were four people near 5411 N. Winthrop. Doxy saw the shooter turn the corner onto Winthrop, raise his hood, and approach Watters, and was "about to cross the street" when the shooting occurred. Unlike in *Jones*, the physical evidence in this case is not inconsistent with Doxy's account. Lastly, in *Jones*, the court stated that claims of actual innocence must be supported " 'with *reliable* new evidence.' " (Emphasis added.) *Id.* ¶ 44 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). However, our supreme court has stated that *Schlup* does not allow a court to judge the reliability of new evidence at the Act's second stage. *Sanders*, 2016 IL 118123, ¶ 37.

¶ 44    In sum, Doxy's affidavit is newly discovered, material and noncumulative, and of sufficiently conclusive character to support defendant's claim of actual innocence. We therefore find that defendant made a substantial showing of his actual innocence. The circuit court erred in granting the State's motion to dismiss and should have advanced defendant's petition for an evidentiary hearing where it could have properly determined the credibility of Doxy's testimony and resolved any evidentiary conflicts.

¶ 45    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for proceedings consistent with this order.

¶ 46    Reversed and remanded.