2024 IL App (1st) 230517-U

FIFTH DIVISION
December 6, 2024

No. 1-23-0517

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 3008-02 |
| | ) | |
| LARRY SCOTT, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Mitchell and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's order granting the State's motion to dismiss defendant's postconviction petition is affirmed where defendant failed to make a substantial showing of actual innocence based on newly discovered evidence.

¶ 2    Defendant Larry Scott, who was convicted of felony murder and burglary, appeals from a circuit court order granting the State's motion to dismiss his petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). On appeal, Mr. Scott contends the court erred in granting the State's motion because he made a substantial showing of actual innocence based on newly discovered evidence where he attached affidavits from two

witnesses attesting that his codefendant, and a primary witness in the State's case against him, told them Mr. Scott did not enter the restaurant in question with the intent to steal a wallet and did not know codefendant had such an intent. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Trial Proceedings

¶ 5     Mr. Scott's conviction arose from the events of January 2, 2003, when restaurant patron Jeanne Burian's wallet was stolen from her purse and, shortly thereafter, pedestrian Quing Chang was killed in a crash caused by a vehicle fleeing the scene, in which Mr. Scott was a passenger. Following arrest, Mr. Scott and two codefendants, Lakesha Smith and Tamika Wilson, were charged with burglary and felony murder predicated on burglary. The burglary charge alleged that Mr. Scott and Ms. Wilson entered the restaurant with the intent to commit theft therein. Ms. Wilson pled guilty to burglary and completed her 4-year and 10-month sentence prior to testifying for the State at Mr. Scott's 2007 jury trial. The jury found Mr. Scott guilty of felony murder and burglary, and the trial court sentenced him to concurrent terms of 25 and 7 years in prison. His conviction was affirmed on appeal. *People v. Scott*, 394 Ill. App. 3d 1104 (2009) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6     Due to the nature of Mr. Scott's postconviction claim, we review the evidence presented at trial. Ms. Wilson testified that, on the afternoon in question, she and Ms. Smith were driving to the mall in Ms. Smith's vehicle when she received a call from Mr. Scott, whom she had known for about a year as "Steve Newsome." At Mr. Scott's request, Ms. Wilson and Ms. Smith picked him up. Mr. Scott asked Ms. Smith to drive him to a location to pick up a friend. Ms. Smith did so and then continued to the area of State and Kinzie Streets in Chicago, which was near the Red Fish restaurant and bar. There, Ms. Smith dropped off Mr. Scott's friend at around 6 p.m.

¶ 7 Shortly thereafter, Mr. Scott received a phone call. According to Ms. Wilson, when he finished his phone conversation, he told Ms. Smith to park because "[t]here was a stang in the Red Fish for us basically." Ms. Wilson explained in court that a "stang is basically an act of we go in and pick-pocket somebody basically, somebody in there." Mr. Scott also related to Ms. Wilson that not many people were inside the restaurant, so they could go in. She agreed in court that her role in the "stang" was to act as a diversion and a lookout.

¶ 8 Ms. Smith parked across the street from the restaurant. Ms. Wilson and Mr. Scott entered the restaurant through the front door and walked around to the bar area in the back, where two customers—a man and a woman—were seated at the far end of the bar. Ms. Wilson noted that there were many empty tables along the walls and many empty seats at the bar. Mr. Scott sat next to the woman, whose back was to him. Her purse was hanging over her chair's backrest. Ms. Wilson sat on Mr. Scott's other side, and they ordered drinks.

¶ 9 Ms. Wilson described what happened next:

"After that I saw [Mr. Scott], he stood up, he took off his jacket and it was like how the bar was made the seats were kind of like under the bar—they had the type of seats where you can hang your purse on the seat. I saw [Mr. Scott] use his jacket as a shield to go into the woman's purse, and I slowly saw him basically taking the woman's purse out of her wallet (*sic*). And after that he began to get up, he put the wallet—kind of like slid it into his pocket, in the front pocket, but still he was hiding his coat, he was using his coat to hide the wallet and he got up and walked out basically."

¶ 10 Mr. Scott told Ms. Wilson to "come on," so she followed him out of the restaurant. She carried her own purse outside, holding it at chest level with her hand around its two straps. She and Mr. Scott had just entered Ms. Smith's vehicle when a bartender ran out of the restaurant and

pointed at them. Mr. Scott told Ms. Smith to start the car before the bartender could get her license plate number. As Ms. Smith drove away, Ms. Wilson saw the bartender entering a police vehicle. Mr. Scott told Ms. Smith "to drive off because of the fact that he had the wallet and he basically was telling us to drive off, he couldn't go back to jail."

¶ 11     At some point during the ensuing pursuit, Mr. Scott handed the wallet to Ms. Smith and directed her to drop it outside the vehicle, which she did at a red light. Mr. Scott screamed at Ms. Smith, "[G]o, go, I can't go back to jail, just go." He told her that if they got to the expressway, the police would stop chasing them, and he grabbed at the steering wheel. Ms. Smith sped through a red light and was hit by a taxi. She kept driving and, as she ran another red light, an SUV hit the passenger side of her vehicle. Ms. Smith's vehicle spun until it crashed into a fence by the sidewalk on the other side of the street. Numerous police officers and firefighters responded to the scene. Eventually, Ms. Wilson was cut out of Ms. Smith's vehicle and taken to the hospital.

¶ 12     On cross-examination, Ms. Wilson confirmed that she never had the wallet in her possession and agreed it was impossible for a bartender to have seen the wallet in her hand. She denied that Mr. Scott told Ms. Smith to stop driving so he could get out and run, and denied that Ms. Smith refused by saying she was on probation and did not want to go back to jail. Ms. Wilson denied that Ms. Smith "placed" the wallet on the pavement, specifying, rather, that Ms. Smith "dropped" it. She also denied that the impact of the collision with the taxi caused Mr. Scott to become unconscious. Finally, Ms. Wilson denied that she had ever been employed as a stripper.

¶ 13     John Young testified that he and Cesar Godinez were working as bartenders at the restaurant on the day in question. Around 6 p.m., Mr. Young saw a man and woman enter the restaurant's front doors. They "looped around" the bar area and then, despite there being many empty seats, sat right next to the only other people at the bar, a couple who were having drinks.

Mr. Young later learned that the couple having drinks were Jeanne Burian and Jay Wise. The man was next to Ms. Burian, and Mr. Young was suspicious because "the positioning was so close, it just looked awkward." The man and woman did not order anything. After about 30 seconds, they stood up, walked back around the bar, and headed toward the front door.

¶ 14    When asked whether he noticed anything about the man and woman as they walked away from the bar, Mr. Young answered, "I believe that I saw a wallet in the hand of the female that was walking away." Mr. Young had a brief conversation with Mr. Godinez. He then asked Ms. Burian if she had her wallet. She checked her purse and said that her wallet was missing.

¶ 15    Mr. Young and Mr. Godinez exited the restaurant and started running after the man and woman, who had entered a vehicle that was driving away. Mr. Godinez waved down a passing police vehicle and spoke with its driver. He then entered the police vehicle, which pursued the man and woman. Mr. Young returned to the restaurant.

¶ 16    On cross-examination, Mr. Young clarified that the man and woman were in the bar area for "[m]aybe a minute, a minute-and-a-half." He denied that the man ordered a beer, drank it, paid, and left a tip.

¶ 17    Mr. Godinez testified that on the evening in question, there were only a few customers at the bar. Ms. Burian and Mr. Wise were seated at the far end of the bar with their backs to the door. Ms. Burian's purse was hanging over her chair, and Mr. Godinez was six to eight feet from them, behind the bar. At around 6 p.m., a man and a woman entered the restaurant. They slowly walked "all the way around the bar," past empty seats, booths, and tables, and stopped next to Mr. Burian and Mr. Wise. They did not order anything, but stood in that spot, with the man behind Ms. Burian, for about a minute or a minute and a half, and then walked out.

¶ 18    When asked whether he saw the man and woman "do anything" while they were standing,

Mr. Godinez answered as follows:

"A. I saw they took something from the lady's purse.

Q. Now, you did not see exactly who went into this purse?

A. No.

Q. You don't know if it was the man or if it was the woman?

A. No. I don't remember right now."

Mr. Godinez also answered the following questions:

"Q. When the *** couple walked away, who walked away first? If you recall.

A. The same way that they walk in.

Q. The woman walked away?

A. Yeah, and he was behind her.

Q. Did you notice anything in the woman's hand?

A. Yes.

Q. What was that?

A. A wallet."

¶ 19     When the man and woman walked away from the bar, Mr. Godinez told Mr. Young that he "saw they took something from her purse." He also asked Mr. Young to tell Ms. Burian to check on her wallet. Ms. Burian looked in her purse and said her wallet was gone.

¶ 20     Mr. Godinez and Mr. Young ran outside, where Mr. Godinez saw the man and woman enter a vehicle that was parked across the street with a woman in the driver's seat. As the vehicle drove away, Mr. Godinez waved down a passing police vehicle and told the officer what happened. The officer directed Mr. Godinez to enter his vehicle and they pursued the fleeing vehicle. During the pursuit, the driver's door of the fleeing vehicle opened and someone dropped a wallet to the

ground. The officer stopped to pick up the wallet and then continued the pursuit.

¶ 21    On cross examination, Mr. Godinez answered the following questions regarding what he saw happen at the bar:

"Q. [Mr. Godinez], I believe early in your testimony you stated that you did not see the wallet being taken, is that correct?

A. I mean, I saw the wallet was gone.

Q. You saw the wallet was gone?

A. Yes.

Q. But you did not see the wallet being taken, correct?

A. I don't remember."

¶ 22    Ms. Burian testified that on the day in question, she met Mr. Wise at the restaurant for a first date. There were "very few" people in the restaurant. She and Mr. Wise sat at the far end of the bar and she hung her purse, which contained her wallet and other items, on the back of her chair. Shortly after 6 p.m., she noticed someone behind her, in the area where she had hung her purse. She testified, "He had his back to me. *** He was right behind me because I looked behind me because I felt him there." Ms. Burian did not notice if anyone was with the man at that time.

¶ 23    Ms. Burian turned back to Mr. Wise and continued conversing with him. Shortly thereafter, "like probably not even a minute," one of the bartenders prompted her to check her purse. She did so and discovered that her wallet was not in her purse and that the man who had been behind her was gone. When she stated that her wallet was missing, a bartender jumped over the bar and ran out the door. Ms. Burian saw a vehicle pull away and then saw the bartender enter a police vehicle.

¶ 24    Jay Wise testified that he met Ms. Burian at the Red Fish for a blind date. There were "[o]nly a couple" of people in the restaurant and a "bunch" of chairs were unoccupied at the bar.

He and Ms. Burian sat toward the end of the bar and Ms. Burian hung her jacket and purse on the back of her chair. At around 6 p.m., Mr. Wise noticed a man and woman enter the restaurant together. They stood inside the door for 10 seconds and then walked around the side of the bar until they were right next to Mr. Wise and Ms. Burian. The man was "[r]ight behind [Ms. Burian] with his back to her." Mr. Wise did not see where the woman was at that time because the man was "pretty big" and he was not paying much attention.

¶ 25    Mr. Wise continued conversing with Ms. Burian, and the man and woman left. A bartender asked Ms. Burian if she had her wallet. She looked in her purse and said it was gone. Two bartenders ran toward the front door. Mr. Wise saw the man and woman run to a vehicle, which sped away. On cross-examination, Mr. Wise confirmed that he did not see anyone take Ms. Burian's wallet.

¶ 26    The State presented evidence that Ms. Chang, a pedestrian, was hit by either Ms. Smith's vehicle or the SUV and died as a result of multiple injuries.

¶ 27    Following closing arguments, the trial court instructed the jurors and admonished them to disregard any reference to the statement, "I am not going back to jail" attributed to Mr. Scott. The jury found Mr. Scott guilty of burglary and felony murder based on burglary. The trial court denied Mr. Scott's posttrial motions and sentenced him to 25 years in prison for murder, with a concurrent 7-year term for burglary.

¶ 28                                B. Direct Appeal

¶ 29    On direct appeal, Mr. Scott contended that the State failed to prove him guilty of murder beyond a reasonable doubt where there were no eyewitnesses to Ms. Chang's death and the police could not say which vehicle killed her. Mr. Scott also contended that his trial counsel was ineffective for (1) failing to defend against the charge of burglary by not arguing in closing that

Ms. Wilson was the sole witness on the issue of intent and that the eyewitnesses did not see who took Ms. Burian's wallet and (2) failing to object to Ms. Wilson's testimony that he told Ms. Smith, "[G]o, go, I can't go back to jail, just go." Finally, Mr. Scott contended that the trial court erred in giving a nonpattern jury instruction regarding the felony-escape rule. We rejected Mr. Scott's contentions and affirmed. *Scott*, slip order at 1.

¶ 30                        C. Postconviction Proceedings

¶ 31    On September 27, 2010, Mr. Scott filed a *pro se* petition for postconviction relief under the Act. In the petition, he claimed that his trial counsel was ineffective for failing to (1) present a particular witness to contradict Ms. Wilson's testimony that she had never been employed as a stripper, (2) request that forensic testing be performed on Ms. Smith's vehicle and the SUV, and (3) request Mr. Scott's phone records from the day in question. Mr. Scott also argued that, during discovery, the prosecution failed to turn over the police report regarding the collision between Ms. Smith's vehicle and the taxi. Finally, Mr. Scott asserted that his appellate counsel was ineffective for failing to raise these issues on direct appeal.

¶ 32    The circuit court appointed counsel on January 14, 2011. Following numerous continuances, counsel filed a supplemental petition for postconviction relief on July 24, 2020. In the petition, counsel asserted a claim of actual innocence based on newly discovered evidence that Mr. Scott did not commit burglary where Ms. Wilson lied about his intent to commit a crime. To support this claim, counsel attached two affidavits to the petition, both of which were undated but notarized in 2019.

¶ 33    In the first affidavit, Yolanda Flemming averred that she became acquainted with Ms. Wilson while they were in jail together. One night, Ms. Wilson started a conversation about her case, stating that she "felt bad about what happened" to Mr. Scott. Ms. Wilson told Ms. Flemming

that, while she and Mr. Scott were at a restaurant, she stole a wallet from another patron. Mr. Scott had been at the bar getting a drink and was unaware that she had stolen the wallet. After she did so, she told Mr. Scott they should leave. Once they were in Ms. Smith's vehicle, she told Mr. Scott about the theft. Ms. Flemming also stated in her affidavit, "I am acquainted with [Mr. Scott]."

¶ 34    In the second affidavit, Marquitta Nelson also averred that she became acquainted with Ms. Wilson while they were in jail together. Ms. Wilson told Ms. Nelson that she "would not be in jail if she had not stolen a wallet." She related that she and Mr. Scott went into a restaurant to eat, not to steal. After she took the wallet, she suggested to Mr. Scott that they should leave the restaurant. Mr. Scott did not know that she had stolen the wallet. Ms. Wilson told Ms. Nelson that she regretted telling the police that Mr. Scott took the wallet, but that she did so because they were threatening her with "a lot of time in prison."

¶ 35    Counsel argued that the affidavits were newly discovered as there was "no way" trial counsel could have discovered Ms. Flemming and Ms. Nelson "during trial" short of interviewing every inmate who was incarcerated with Ms. Wilson in the hope that someone would tell them Ms. Wilson was lying. Counsel asserted that the affidavits were material and not cumulative as they contradicted Ms. Wilson's trial testimony, which provided the basis for finding the element of intent and identified Mr. Scott as the person who took the wallet. Finally, counsel argued that the affidavits were of such conclusive character so as to probably change the outcome of the trial because they undermined the credibility of the one witness "who basically laid blame on [Mr. Scott] for this crime."

¶ 36    On March 3, 2021, after Mr. Scott's initial attorney retired, a new attorney representing him filed a supplemental petition for postconviction relief, raising numerous claims. Relevant here, counsel claimed that Mr. Scott was actually innocent of burglary, again relying on Ms. Flemming's

and Ms. Nelson's affidavits. Counsel then filed an amended supplemental postconviction petition on August 24, 2022, in which he raised an additional claim not at issue in this appeal.

¶ 37    The State filed a motion to dismiss on August 30, 2022. In relevant part, the State argued that Mr. Scott failed to demonstrate an actual innocence claim where the affidavits provided only "cumulative impeachment that fails to be material to [Mr. Scott's] charges." On September 12, 2022, counsel filed a response.

¶ 38    The circuit court held a hearing on the State's motion, after which, on February 27, 2023, it issued a written order dismissing Mr. Scott's postconviction petition.

¶ 39                                II. JURISDICTION

¶ 1    The circuit court dismissed Mr. Scott's postconviction petition on February 27, 2023, and he timely filed a notice of appeal from that dismissal on March 14, 2023. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 606 (eff. March 12, 2021) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 40                                III. ANALYSIS

¶ 41    On appeal, Mr. Scott contends that the circuit court erred in granting the State's motion because he made a substantial showing of actual innocence based on newly discovered evidence where Ms. Flemming and Ms. Nelson averred in their affidavits that Ms. Wilson told them she stole the wallet, Mr. Scott did not enter the restaurant with the intent to commit a theft, and he did not know she had such an intent.

¶ 42    A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would

probably change the result on retrial. *Id.*; *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is considered new where it was discovered after trial and could not have been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The conclusiveness of the evidence is the most important element of an actual innocence claim. *People v. Edwards*, 2012 IL 111711, ¶ 40.

¶ 43     In this case, we need not address the parties' arguments regarding whether Ms. Flemming's and Ms. Nelson's potential testimony is newly discovered, material, or noncumulative. This is because Mr. Scott fails to meet the requirement that the supporting evidence must be so conclusive that, when considered along with the trial evidence, it would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123, ¶ 47; *Coleman*, 2013 IL 113307, ¶¶ 84, 96.

¶ 44     The conclusive-character element requires a petitioner to "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 56. In the context of second-stage proceedings, where petitioners are required to make a substantial showing of actual innocence to avoid dismissal, new evidence does not satisfy the conclusive-character requirement if it merely contradicts the testimony of other occurrence witnesses or adds conflicting evidence to the evidence adduced at the trial. *Sanders*, 2016 IL 118123, ¶¶ 37, 52-53; see also *Robinson*, 2020 IL 123849, ¶¶ 57-59 (recognizing that the " 'conflicting evidence' standard" applied in second-stage proceedings in *Sanders* and in third-stage proceedings in *Coleman* and *Ortiz*).

¶ 45     Here, Mr. Scott argues that the information in Ms. Flemming's and Ms. Nelson's affidavits is of such conclusive character that it would in all likelihood change the outcome upon retrial

because evidence that Ms. Wilson lied about his intentions prior to entering the restaurant provides strong evidence that he is innocent. He asserts that the affidavits raise the probability that it is more likely than not that he would not have been convicted of burglary and felony murder had the jury heard "a contradictory version of events." He further argues that, although hearsay, the affidavits must still be considered as true for purposes of determining whether a third-stage hearing is required.

¶ 46    The State responds that the affidavits are not conclusive because they merely impeach Ms. Wilson's trial testimony and do not undermine the totality of the trial evidence establishing Mr. Scott's intent. We agree with the State.

¶ 47    At trial, Ms. Wilson testified that Mr. Scott told her about the "stang" opportunity in the restaurant and that, once inside, he removed the wallet from Ms. Burian's purse while she acted as a diversion and lookout. Taking the contents of Ms. Flemming's and Ms. Nelson's affidavits as true—specifically, that Ms. Wilson told them she stole the wallet and Mr. Scott was unaware at the time that she had done so—the affidavits would, at most, merely impeach Ms. Wilson's trial testimony. Where evidence merely impeaches trial testimony, it is not typically of such conclusive character as to justify postconviction relief. *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 58; *People v. Brown*, 2020 IL App (1st) 190828, ¶¶ 70, 71; *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008), *overruled on other grounds by Robinson*, 2020 IL 123849; see also *People v. Smith*, 2024 IL App (1st) 210496-U, ¶ 32; Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 48    Neither Ms. Flemming nor Ms. Nelson indicated in their affidavits that they had any personal knowledge of the events leading to Mr. Scott's conviction. Rather, their affidavits conveyed statements that Ms. Wilson allegedly made to them and which, if accepted by the jury,

could only be used to contradict and impeach Ms. Wilson's trial testimony. See *People v. Bailey*, 2016 IL App (3d) 140207, ¶ 33 (finding an affidavit was not so conclusive "that it would probably change the result on retrial" because, at most, it "could only be used to contradict and impeach" trial testimony). Neither affidavit indicates that Ms. Wilson would now testify any differently than she did at Mr. Scott's trial. As such, Ms. Flemming's and Ms. Nelson's affidavits fail "to 'raise the probability that it is more likely than not that no reasonable juror would have convicted [the defendant] in the light of the new evidence.' " *Bailey*, 2016 IL App (3d) 140207, ¶ 33 (quoting *Edwards*, 2012 IL 111711, ¶ 31); see also *People v. Cooper*, 2022 IL App (2d) 200182-U, ¶¶ 22, 36-37 (finding an affidavit was not conclusive where it presented "nothing more than potential impeachment" of a trial witness based on statements she allegedly made to the affiant); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 49    Moreover, Ms. Wilson's testimony was not the only evidence presented at trial of Mr. Scott's intent to commit a theft in the restaurant. In burglary cases, a person's intent is often proved by circumstantial evidence. *People v. Johnson*, 2019 IL 123318, ¶ 25. Circumstances that are relevant to prove such intent include the time, place, and manner of entry; the defendant's activity within the premises; and any alternative explanations offered for his presence. *People v. Nepras*, 2020 IL App (2d) 180081, ¶ 22.

¶ 50    Here, circumstantial evidence of Mr. Scott's intent was provided by the trial testimony of Mr. Young, Mr. Godinez, Ms. Burian, and Mr. Wise. All four of these witnesses testified as to the near emptiness of the restaurant and bar area when Mr. Scott and Ms. Wilson arrived. Ms. Burian and Mr. Wise were the only two patrons at the bar. Mr. Wise noted that when Mr. Scott and Ms. Wilson entered the building, they paused inside the door for about 10 seconds. Then, Mr. Young,

Mr. Godinez, and Mr. Wise saw the pair circle the bar and, after passing by ample available seating, stop right next to Ms. Burian. Mr. Young recalled that Mr. Scott sat awkwardly close to Ms. Burian; Mr. Godinez, Ms. Burian, and Mr. Wise placed him standing right behind Ms. Burian, in the area where she had hung her purse on the back of her chair.

¶ 51   Mr. Young and Mr. Godinez testified that Mr. Scott and Ms. Wilson did not order anything at the bar, and they both estimated that Mr. Scott and Ms. Wilson left the area within a minute and a half. Ms. Burian, similarly, testified that "probably not even a minute" passed between the time she noticed Mr. Scott right behind her and when Mr. Young prompted her to check her purse. When Mr. Scott left the restaurant, Mr. Young, Mr. Godinez, and Mr. Wise saw him enter a waiting vehicle, and all four witnesses saw the vehicle speed away from the scene. Police subsequently recovered Ms. Burian's wallet, which had been thrown from the vehicle. Even without Ms. Wilson's testimony, the circumstantial evidence provided by Mr. Young, Mr. Godinez, Ms. Burian, and Mr. Wise was sufficient for the jury to find that Mr. Scott had the intent to commit a theft when he entered the restaurant. See, *e.g.*, *People v. York*, 2020 IL App (2d) 160463, ¶ 19 (finding sufficient circumstantial evidence of intent to commit a theft where, *inter alia*, the defendant's actions in the store were quick and deliberate and a getaway driver was waiting for him).

¶ 52   While Ms. Flemming's and Ms. Nelson's affidavits, by impeaching Ms. Wilson's testimony, might provide a basis to argue the existence of a reasonable doubt, that is not the standard for a claim of actual innocence. *People v. Horton*, 2021 IL App (1st) 180551, ¶ 43; see also *People v. Coleman*, 381 Ill. App. 3d 561, 568 (2008) (noting that an allegation of newly discovered evidence of innocence is not intended to question the strength of the State's case). Mr. Scott has failed to "present evidence that places the trial evidence in a different light and

undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. Where Mr. Scott has not carried his burden to make a substantial showing of actual innocence, second-stage dismissal of his postconviction petition was proper. See *Sanders*, 2016 IL 118123, ¶ 55 (affirming the dismissal of a postconviction petition at second-stage proceedings where the petitioner "failed to carry his burden to make a substantial showing of actual innocence").

¶ 53                                IV. CONCLUSION

¶ 54    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 55    Affirmed.