2025 IL App (1st) 241491-U

FIRST DIVISION
December 15, 2025

No. 1-24-1491

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 01 CR 1800201 |
| TIMOTHY MALONE, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concur in the judgment.

**O R D E R**

¶ 1    *Held*:  The circuit court properly denied the petitioner's postconviction petition after a third-stage evidentiary hearing.

¶ 2    After a jury trial in the circuit court of Cook County, the petitioner, Timothy Malone, was found guilty of first-degree murder, and sentenced to 56 years' imprisonment. The petitioner now appeals from the third-stage dismissal of his petition for relief pursuant to the Post-Conviction

Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)). He contends that the circuit court erred when it found that the evidence of his actual innocence offered at the evidentiary hearing was insufficient to require postconviction relief. For the following reasons, we affirm.

¶ 3                                                                              I. BACKGROUND

¶ 4        On May 9, 2001, the victim, Eric Wilson, was shot and killed while working on his friend, Kevin Turner's car. In July 2001, the petitioner was charged with, *inter alia*, the first-degree murder of Wilson, and the attempted first-degree murder of Turner. The petitioner proceeded by way of a jury trial. Because the evidence adduced at that trial is set forth fully in our decision following the petitioner's direct appeal (*People v. Malone*, No. 1-04-2536 (August 18, 2006) (unpublished order pursuant to Illinois Supreme Court Rule 23) (*Malone I*)), we only summarize the relevant evidence here.

¶ 5        Three eyewitnesses, Turner, Robert Hart, and Pierre Offord, testified that on May 9, 2001, the petitioner shot Wilson in front of 7351 South Carpenter Street in Chicago, and identified the petitioner from lineups and in open court.

¶ 6        Turner first testified that, on that day, he had returned home from playing professional basketball in Poland and had asked Wilson to reinstall his car rims for him. As Turner watched Wilson working on his car, while Wilson's sixteen-month-old son played in a stroller nearby, a van approached, and Turner observed the petitioner, who was sitting in the front passenger seat of the van, lean over the driver, stick his head out of the window and ask, "How much you selling the rims for?" After Wilson replied that the rims were three "stacks," which was a street term for three thousand dollars, the petitioner responded, "All right," and the van drove away. Approximately 15 to 20 minutes later, Turner observed the same van pull up and three to five men, including the petitioner, jump out with guns. The petitioner shouted, "Where is my f***ing Monte Carlo?" and

pointed a gun at them. Wilson responded that he did not know what the petitioner was talking about and tried to back away. Turner testified that as he moved backwards, he tripped over a short fence, and gunfire erupted. Turner ran down the street and managed to escape through a gangway into the back alley, whereupon he saw Wilson collapsed on the ground and bleeding.

¶ 7 Turner admitted that when he spoke to police immediately after the shooting, he described all the men that jumped out of the van as "male blacks, 25-30 years of age," with no variations. He admitted that he could not discern the shooter's height and could not recall what the shooter was wearing, because he "was looking at him in the eyes when he was speaking," and "three to four people [were] holding guns and pointing them at me *** [and my] attention was for the fear of my life of possibly being shot."

¶ 8 Turner testified that about seven weeks after the shooting, on June 28, 2001, he was informed by the police that they had a possible suspect in the shooting, after which he proceeded to the police station to view a lineup. Turner identified the petitioner as the man in the van who asked about the rims and who subsequently shot at him and Wilson. Turner could not recall how many people were in the lineup but stated that all the participants were standing and had no coverings on their heads.

¶ 9 The second eyewitness, Robert Hart, testified consistently with Turner. He stated that around noon on May 9, 2001, he helped carry the rims from Turner's basement to his car, so that Wilson could install them. Hart was standing about 20 feet away from Wilson, who was on the ground working on the car, when a van drove up and the petitioner, whom Hart had seen in the neighborhood once before, stuck his head out of the driver's side window and asked, "How much for the rims?" In response, Wilson stated that the rims were "three stacks," meaning three thousand dollars.

3

¶ 10    Approximately 15 to 20 minutes later, while Hart was talking to Turner, the van pulled up again and Hart saw the petitioner and four or five other men, all carrying guns, get out. Corroborating Turner, Hart testified that the petitioner pointed his gun at Wilson and said, "These my mother***ing rims; where is my mother***ing Monte Carlo?" After Wilson replied that he did not know what the petitioner was talking about, Wilson and Turner started to back away, but Turner tripped and the men with guns began to shoot. According to Hart, at that point, more men jumped out of a nearby station wagon and also started shooting.

¶ 11    Hart acknowledged that he did not know which of the men that came out of the van fired the first shot, because he was "trying to pay attention to everybody because they all had guns" to "see what they [were] going to do, and when the first shot went off, that [wa]s when I turned and looked at" the petitioner and "saw him firing." As Hart ran to the alley for cover, he saw Wilson running in the same direction and realized Wilson had been shot. Hart helped another neighbor, Casey Atkins, put Wilson in a car before an ambulance arrived.

¶ 12    Hart did not remain at the scene to speak with the police because he was afraid that the shooters would "do something to" him. When he spoke to police later, however, he described the shooter as having braids. On June 28, 2001, Hart identified the petitioner from a lineup as one of the shooters. He subsequently identified the petitioner in open court.

¶ 13    The third eyewitness, Pierre Offord next testified that on May 9, 2001, he was 14 years old, lived next door to Wilson, and was good friends with Turner and Hart. At approximately noon that day, he was home from school because he did not feel well. Offord was sitting on the front porch, which was about 16 to 17 feet away, watching Wilson install the rims on Turner's car, while Wilson's toddler son played in a stroller nearby, when he saw an Astro van approach. According to Offord, the petitioner, who was sitting on the passenger side of the van, stuck his head out of

the driver's side window and asked about the rims. Wilson replied that he would sell the rims for three thousand dollars, and the petitioner stated that he would be back in 15 minutes.

¶ 14    Offord testified that, about 20 minutes later, the van returned and seven or eight men, all with guns, jumped out. The petitioner, who had a black automatic weapon, asked Wilson, "Where is my Monte Carlo?" When Wilson responded that he knew "nothing about a Monte Carlo," the petitioner started to shoot. According to Offord, Wilson tried to run, but a shot hit him in the shoulder, and he fell to the ground. Wilson got up and ran again, with the petitioner in pursuit. Offord testified that the other men from the van also began to shoot, after which a station wagon pulled up behind the van and another man, with a semi-automatic gun, jumped out and did the same.

¶ 15    Offord averred that, as the shots rang out, he jumped off the porch and tried to grab Wilson's son who was still near the stroller but one of the armed men ordered him to "put the baby down." Offord obeyed and ran through the gangway to the alley behind. Once there, he saw Wilson on the ground, bleeding and Atkins helping him into a car. Offord did not stay at the scene or speak to police that day and instead left the city and went to his aunt's house with his mother because he was afraid that the men with the guns were still in the area.

¶ 16    The next day, May 10, 2001, while in school, Offord went to his principal and told her what he had witnessed. The principal called Offord's mother and the police. Offord was taken to the police station where he was interviewed by Chicago Police Detective Eugene Jackson. Seven weeks later, on June 28, 2001, Offord viewed a lineup from which he identified the petitioner as the shooter. He stated that all the participants in the lineup were sitting down and had no head coverings. Offord also identified the petitioner as the offender in open court.

¶ 17    On cross-examination, Offord testified that at the time of the shooting, the petitioner had

5

braids and wore a shirt but could not recall whether he gave that description to Detective Jackson when he was interviewed on May 10, 2001.

¶ 18    Detective Jackson next testified that during that interview, Offord described the shooter to him as 5'9" to 5'11" tall, with a dark complexion and braids, and wearing blue jeans and gym shoes, but no shirt. Offord also told the detective that two additional vehicles, instead of just one, showed up after the van, from which people began firing.

¶ 19    Detective Jackson also testified that all the shooters were initially described to him as he "male blacks 20 to 25 years of age," 180 to 200 pounds, wearing blue jeans and gym shoes. He also acknowledged that in his subsequent conversation with Turner, Turner did not mention the car rim conversation or the petitioner asking Wilson about his Monte Carlo, and instead told the detective that the van slowly drove by after which it returned and three armed men exited, one of whom said, "don't f***ing move." Detective Jackson also acknowledged that there was no police report or photo of the lineup viewed by Turner.

¶ 20    The defense called only one witness, Gerald Cuthbertson, who testified that on May 9, 2001, together with his son, he was installing an ornamental iron fence at Stagg Stadium, which was at the southern tip of South Carpenter Street, when he observed a van and another vehicle pull up, and people exit with guns. Suspecting that the scene would become dangerous, Cuthbertson and his son sought safety and left the area. As Cuthbertson was moving, he heard gunshots. While Cuthbertson testified that he did not see who fired the shots or whether groups of people were shooting at each other, the parties subsequently stipulated that when Cuthbertson spoke to Detective Jackson at the crime scene, he told the detective that both groups started shooting at each other.

¶ 21    In closing, defense counsel argued that the three eyewitness identifications were suspect,

6

and that the petitioner was not present for the shooting. The State, on the other hand, asserted, *inter alia*, that the three eyewitnesses corroborated each other and that "the bottom line to all of this identification stuff is that you never forget life and death moments like that when someone is threatening your life," and "you don't forget the face of the person who took your friend from you forever."

¶ 22     During deliberations, the jury sent out five notes. The first asked whether any of the witnesses had told the police that the petitioner was actually at the crime scene, and the second requested transcripts of the testimony of all the witnesses. Without objection, the trial judge answered both notes by informing the jury that they had heard all the evidence, should use their collective recollection of the testimony, and continue to deliberate. The third note stated, "We, the jury, have decided that we can't come to a unanimous agreement because of insufficient evidence. What happens[?]" The trial judge instructed the jury to continue to deliberate and subsequently sequestered it for the night.

¶ 23     On the second day, the jury sent a fourth note requesting the transcript of Detective Jackson's testimony, which was provided without objection, followed by a fifth note, which read:

> "We, the jury, cannot come to a unanimous verdict. It is impossible to change the votes of
> the jurors. Any more deliberation will only cause more damage to all of the jury members'
> hearts. Please take action upon this problem please."

The trial judge called the jury into the courtroom, read them the *Prim* instruction[1] and asked them to continue to deliberate.

¶ 24     The jury ultimately found the petitioner guilty of the first-degree murder of Wilson but acquitted him of the attempted first-degree murder of Turner. The jury also found that the petitioner

---

[1] This instruction stems from *People v. Prim*, 53 Ill. 2d 62 (1972) and is given whenever a jury is deadlocked.

personally discharged the firearm that caused Wilson's death. The trial court subsequently sentenced the petitioner to a total of 56 years' imprisonment (36 on the murder conviction and 20 for the mandatory firearm enhancement).

¶ 25    The petitioner appealed his conviction, arguing, *inter alia*, that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erroneously limited his cross-examination of Offord and Hart[2] but allowed evidence that he had a criminal past; and (4) the jury was coerced into rendering a guilty verdict by the trial court's answer to the jury's third note.

¶ 26    This court affirmed the petitioner's conviction and sentence. See *Malone I*, No. 1-04-2536 (August 18, 2006) (unpublished order pursuant to Illinois Supreme Court Rule 23). In doing so, we found, *inter alia*, that the State's evidence was sufficient to sustain a guilty verdict and that the trial judge properly instructed the jury. *Id*. at * 5-6, 11-13. While we found it was erroneous for the trial court to prevent defense counsel from cross-examining Offord and Hart regarding their criminal histories, we nonetheless concluded that this error was harmless in light of the "overwhelming evidence" of the petitioner's guilt. *Id.* at * 7. At the direction of our supreme court (*People v. Malone*, 222 Ill. 2d 590 (2006)), we subsequently reconsidered our decision in light of *People v. Patters*on, 217 Ill. 2d 407 (2005), and once again affirmed the petitioner's conviction and sentence on appeal. See *People v. Malone*, No. 1-04-2536 (January 26, 2007) (unpublished order pursuant to Illinois Supreme Court Rule 23) at * 2.

¶ 27    On December 21, 2007, the petitioner filed his first postconviction petition alleging, *inter alia*, that he was denied his right to a fair trial, when, during deliberations, a Cook County

---

[2] The trial court prohibited defense counsel from questioning Offord and Hart about the charges they had accumulated between the time of the shooting (in 2001) and the petitioner's trial (in 2004) and which the State had *nolle-prossed* with the ability to reinstate prior to the petitioner's trial. These included: Hart's two charges for possession of cannabis, and Offord's charges for burglary, aggravated battery, assault, and domestic battery.

Sherriff's Deputy made statements to the jury about his guilt. The petition proceeded to a third-stage evidentiary hearing, after which it was dismissed. We subsequently affirmed the circuit court's decision on appeal.[3] See *People v. Malone*, 2012 IL App (1st) 103195-U, ¶ 31 (*Malone II*).

¶ 28   On March 22, 2023, the petitioner filed the instant successive postconviction petition, alleging, *inter alia*, a claim of actual innocence. In support, the petitioner attached numerous exhibits, including, *inter alia*: (1) an expert report regarding eyewitness identifications by Dr. Caren M. Rotello; (2) a recantation affidavit from Offord, (4) an affidavit from a new eyewitness to the shooting, Sergio Williams, (5) affidavits from the petitioner's girlfriend Michelle Moore, and her sister Sabrina Moore, attesting that Michelle and the petitioner had moved to Moline in April 2001, and were only visiting Chicago in June 2001, when he was arrested there; (6) an affidavit from the petitioner's trial counsel, James Mullenix, attesting to his memory of the trial proceedings, including numerous jury notes sent out during deliberations, one of which indicated that the jury was deadlocked such that "[a]t some point, the attorneys were collectively looking at their calendars" to schedule "the retrial" because they "believed that the jury was going to be hung"[4]; (7) an affidavit from postconviction counsel's investigator, Amy Kaspar, regarding her unsuccessful attempts to communicate with Turner and Hart; and (8) an affidavit from the petitioner proclaiming his actual innocence.

¶ 29   By agreement of the parties, the petition advanced to the third stage of postconviction

---

[3] In doing so, we found nothing manifestly erroneous in the circuit court's finding that there were no improper communications between the deputy and the jurors and that the jurors were not in disagreement about the evidence, but rather that there was one juror with "an axe to grind" who "threw water in the face of the jury foreman," and appeared "to have a 'deep-seated bias and motive to testify falsely[,]' " as she had indicated that "she did not want to sit in judgment of someone else, which violated her oath as a juror." *Malone II*, 2012 IL App (1st) 103195-U, ¶ 21.

[4] Mullinex further attested that at the time of trial he was unaware that Offord was living with Wilson's child's mother, and that had he been aware of this information he would have used it to cross-examine Offord to show bias.

proceedings. On May 29, 2024, the circuit court held an evidentiary hearing at which the following relevant evidence was adduced.

¶ 30    Williams, who was currently serving a 66-year sentence for first-degree murder and attempted murder, first testified that in May 2001, he was 19 years old and lived one block east of Wilson's home. Williams was friends with Wilson, Offord, Hart and Turner's brother, and was familiar with the petitioner from the neighborhood but was not friends with him.

¶ 31    On May 9, 2001, Williams was on South Carpenter Street near 74th Street heading to Offord's house when he saw a van and a station wagon stop. Two people hopped out of the van with guns, and he "took off running." Before the van stopped, Williams was watching it because he "wanted to see who was pulling up." He explained that he was "focused on the [van] because it [was] a habit, you always look[ed] at cars when they r[o]de past." Inside, he saw "two dark skinned guys" in the van's driver's and passenger's seats. Williams testified that he had seen both men "[d]riving through there a couple of times down 72nd Street" and although he did not know their names or nicknames, he was certain that the person in the passenger seat was not the petitioner.

¶ 32    Williams admitted that he never spoke to the police at the crime scene or later when he learned that Wilson had been killed. He also claimed that even though he saw the van's driver and passenger "visiting somebody on 72nd Street" after the shooting, he did not inform the police because he was taken into custody on his own murder charge.[5]

¶ 33    Williams averred that he was not aware that an arrest had been made in Wilson's murder until he was incarcerated and claimed that he first learned that the petitioner had been convicted

---

[5] Williams was arrested for first degree murder and attempted murder on April 23, 2004, and was in custody on another charge between December 2001 and February 28, 2004.

10

of Wilson's murder about five or six years ago, from another inmate, Terrence Polk. Williams did not know Polk before he was incarcerated but had known his sister. Polk told Williams that "Tim Tim" had been convicted of Wilson's murder, but Williams did not know who "Tim Tim" was until Polk pointed out the petitioner to him a few weeks later. Williams then told Polk that the petitioner was not present for the shooting.

¶ 34   On cross-examination, Williams acknowledged that he was about 20 feet away from the van when the two men got out. When asked if either of these individuals looked at him as they exited the van, Williams stated "they hopped out like they was going to do something and they had guns. I wasn't staying around to see." Williams also acknowledged that he did not see if anyone exited the station wagon because "when two people hopped out of the van with guns, I ran."

¶ 35   Offord next took the stand and recanted his trial testimony. Offord now testified that as he was watching Wilson putting rims on Turner's car from his front porch, he saw a vehicle pull up near Wilson and Turner, "conversate and then pull off." Offord did not hear what was said. He did not think that the car was a van and could not see who was inside the car because there was a big tree blocking his view. When asked if he could show that tree on a trial exhibit photo of the crime scene, however, Offord claimed that he could not because "it was another bigger tree that was farther away."

¶ 36   Offord testified that about 15 to 20 minutes later "a few cars pulled up," "there was no talking at all," and gunshots erupted. Offord stated that there was more than one car, including a van, but could not recall how many or whether they were the same cars that had been there minutes before. Offord testified that he did not see who jumped out of the cars, who was shooting, or how many shooters there were, because as soon as he heard gunfire, "looked up,

11

[and saw] people shooting," he "didn't stick around." Instead, trying to get out the line of fire, he jumped off the stairs and hid under an opening in the porch, where he stayed until the shooting stopped, which was less than a minute.

¶ 37     After the gunfire ceased, Offord went to grab Wilson's son out of the stroller and held him. No one came up to him, put a gun to his head, or told him to put the baby down, and he could not recall having testified to this at the petitioner's trial. Offord went to the alley where he saw Wilson was shot and eventually gave the baby to Wilson's girlfriend and the child's mother, Nono.

¶ 38     Offord testified that he did not talk to the police at the scene and instead went to his grandmother's house. On the following day, at school, he spoke to his principal and told her about the shooting. He could not recall whether he told the principal that he saw the shooter but testified that he did not tell her that it was the petitioner.

¶ 39     Offord acknowledged that sometime later he identified the petitioner from a lineup but averred that he never told anyone prior to that lineup that he had seen the shooter's face. Offord testified that he identified the petitioner from that lineup because he had previously seen the petitioner in the neighborhood and "[w]hen they showed me the lineup, I just pointed out the familiar face." As Offord explained:

> "[I]t was just a familiar face. Once I seen his face, I was like oh, that's got to be him, but now thinking like now that I am older that I could have just seen him before, that's what made him look familiar to me, you know, and it was already done."

¶ 40     In addition, Offord explained that, a year after the shooting, when he was 15 years old, his mother died, and he started living "[o]n the street," but several neighbors, including Nono, "helped [him] out and let [him] stay at their house[s] from time to time." As a result, he "felt that

[he] had an obligation to the lady Nono because she helped [him] out with letting [him] stay with her." As Offord explained, "And me being in her house, hearing her crying at night and all type of stuff. And growing up with her son at the same time, it felt like it was the right thing at that time." And, "I was young, trying to think like I'm doing the right thing and then didn't really think through what I was doing." Offord, however, acknowledged that Nono never told him that he had to identify anyone and never put any pressure on him.

¶ 41    Offord next testified that after the petitioner's trial, he did not discuss the case with anyone for the next ten years. Around 2019, some mutual friends he and the petitioner had from the neighborhood began "reaching out, trying to get him to talk" to the petitioner's postconviction counsel. Several years later, Offord eventually spoke with postconviction counsel and signed an affidavit on February 24, 2021. By that time, he had spoken to Nono and told her that he "hadn't really seen anyone's face" and had "tried to make it right for [her] and [her] son," but "then w[o]und up messing somebody else's life up," and Nono told him to "do what's right."

¶ 42    On cross-examination, Offord acknowledged that between the shooting and the petitioner's trial, he never told anyone that he had not seen the shooter's face and could not identify anyone. He also acknowledged that on the day after the shooting he went to talk to his principal of his own accord and told her what he saw happen because he felt guilty about not having stayed at the scene and spoken to the police. Offord also acknowledged that once his mother and the police arrived at school, he told the police detective "the truth."

¶ 43    On cross-examination, Offord also stated that when the shooting started, he saw Williams with Hart, Turner and Wilson. In addition, he denied having any plans to hang out with Williams that day.

¶ 44    The circuit court next questioned Offord about his statement in his affidavit that he was

13

aware of "others who [were] in prison for crimes that they didn't do," and that "it has now hit [him] that this could be a case of that too." Offord explained that he meant people were often "found guilty by association." He acknowledged that this belief was not based on any facts but rather on "stuff that people [were] talking about."

¶ 45     The petitioner next took the stand own his own behalf, denied any involvement in the shooting and stated that he did not know Wilson, Turner, Hart, Offord or Williams. The petitioner explained that in September 2000, together with his girlfriend Michelle, and his two young children, he moved into a house located at 73rd Street and South Aberdeen to live with his grandmother, aunt, and numerous cousins. The petitioner averred that he was new to the neighborhood and did not know anyone there. In March 2001, he, Michelle and the children moved to Moline to live with Michelle's mother. The petitioner acknowledged that he was arrested in Chicago on June 29, 2001, but explained that he and Michelle had come up from Moline for a couple of weeks to celebrate his son's birthday with family.

¶ 46     On cross-examination, the petitioner acknowledged that prior to 2001, he had been convicted of aggravated battery of a peace officer in 1998 and unlawful use of a weapon by a felon in 1999.

¶ 47     Eyewitness identification expert, Dr. Rotello, next testified that on March 5, 2024, she prepared a report regarding the reliability of the three eyewitness identifications, which formed the basis for the petitioner's conviction. Dr. Rotello opined that based on cognitive research and her review of the instant case, there was a strong possibility that the petitioner was misidentified as the shooter. Dr. Rotello explained that cognitive research has identified several factors that are associated with increased risk of memory errors and mistaken identifications. The first is memory retention. According to Dr. Rotello, human memory does not operate like "a video

recording encoding the details of our lives." Instead, people start forgetting within the first ten minutes. Dr. Rotello testified that human memory is reconstructive. As she explained, any memory we retrieve "is a reconstruction of the original events possibly mixed up with post-event information provided by our own inferences or conclusions or thoughts about what must have been, along with information that might have been provided from other sources," such as "other individuals as we have conversations about [the] events." Because of this, it is often impossible for witnesses to know which recalled details stem from the original memory and which have been unknowingly incorporated after the fact. Accordingly, the most accurate reports tend to be the ones reported the earliest.

¶ 48    Dr. Rotello testified that in the instant case, the pattern of memory reports regarding the shooting was consistent with the introduction of new information obtained after the fact to the initial memory. As Dr. Rotello explained, the initial description of the assailants was very generic, (*i.e.*, they were three black men, aged 20-25) and more elaborate descriptions (regarding height, weight, clothing and complexion) emerged only later, evolving up to trial. Moreover, the lineup identifications were made seven weeks after the shooting, during which the witnesses would necessarily have begun to forget details and could have been exposed to post-event information distorting their original memory. Because the three witnesses here were friends and lived in the same neighborhood, "it struck [Dr. Rotello] as a distinct possibility that there would have been conversations about the shooting" between them, and/or fueled by rumors circulating in the neighborhood. As she opined, this type of post-event conversation tended to distort the memories of individuals to be more similar, and to include details observed by others and not oneself.

¶ 49    Dr. Rotello next explained that the recognition of "strangers" is "quite difficult" both

15

because of how we perceive and how we remember. As she elaborated, when studied under optimal lab-based viewing conditions, false positives were reported 20% to 25% percent of time. Moreover, in studies of perceptual matching tasks, where memory was eliminated, and participants were asked to match a series of faces, the correct face was selected only slightly over half the time. As such, Dr. Rotello opined, it was unsurprising that roughly three quarters of studied DNA exoneration cases involved erroneous identifications of strangers, and about one third of those involved multiple eyewitnesses' misidentifications of the same innocent suspect.

¶ 50    Dr. Rotello next testified that repeated exposure to a stranger's face is usually necessary for recognition. While there is no one fixed number of encounters essential for such recognition, studies have found that participants generally need 13 to 15 exposures to name a face accurately. In addition, if those exposures are too brief, or made from too far a distance (over six feet), the likelihood of misidentification increases.

¶ 51    Moreover, according to Dr. Rotello, perception and memory are negatively impacted by scene complexity, the presence of weapons, and the level of stress during an event. The more complex the scene (*i.e.*, the more bystanders or perpetrators present) the more demands are placed on the witness' cognitive processes, and the likelihood of an accurate identification decreases. Similarly, contrary to the understanding of most jurors, the presence of a weapon tends to draw attention away from the perpetrator's face and increases the likelihood of misidentification. In addition, she testified regarding studies of military training exercises, where soldiers were unable to identify their interrogators after stressful interrogations.

¶ 52    Based on all this scientific research, Dr. Rotello opined that, in the present case, the following factors influenced the ability of the three eyewitnesses to perceive and accurately remember the petitioner. First, the eyewitnesses were asked to identify a stranger, whom they

had viewed only once and very briefly prior to the second encounter when the shooting began. Using Google maps, Dr. Rotello estimated the distance from which they observed the stranger during this first encounter to be at least 20 feet. Second, the scene of the shooting was chaotic and included numerous perpetrators. As Dr. Rotello explained, numerous people were outside on the street prior to the shooting, as many as three vehicles approached the two victims, and anywhere between two to eight shooters emerged from those vehicles before gunfire erupted and everyone ran for cover. Third, the event itself was very stressful and involved multiple weapons. As Dr. Rotello explained, the eyewitnesses testified at trial that they were in fear for their lives and could not provide the police with a more detailed description of the shooters because they were focusing on the weapons. In addition, the eyewitnesses identified the petitioner from lineups seven weeks after the original event. Accordingly, these factors, either individually or collectively, reduced the probability of the three eyewitnesses having an accurate memory of the events and increased the likelihood of misidentification.

¶ 53    Dr. Rotello also discussed the fairness of the lineup procedures in this case. First, she testified that the best practice is to have lineups conducted by a "blind" administrator, *i.e*., one who does not know which of the lineup participants is the suspect. She explained that contrary to what most jurors believed, even subtle or unintentional cues from a non-blind administrator (such as encouraging a witness to take their time, or to look carefully) can double the number of false identifications. In addition, because witnesses generally tend to pick the person with the most familiar face, and familiarity is subjective (*i.e*., it can come from anywhere, including, the crime itself, a mugshot book, having seen the person elsewhere, similarity with a familiar person), a fair identification procedure requires that the fillers embody the suspect's features and that any distinctive features be either covered or duplicated on all the participants. In addition, a

17

fair lineup needs at least six fillers.

¶ 54    Dr. Rotello opined that her review of the reports and photographs of the lineups viewed by Hart and Offord, here, revealed a likelihood of misidentification. Both were conducted by non-blind administrators, and the petitioner "may have stood out" because of certain features that distinguished him from the rest of the participants. Specifically, in Hart's lineup, which was comprised of five participants (including the petitioner), the petitioner was the youngest by eight years and was one of only three individuals who wore braids and had a white shirt. Similarly, in Offord's lineup, the petitioner was the youngest by eight years and one of only two men with braids, both of whom were also wearing white shirts.

¶ 55    Based on the aforementioned factors, Dr. Rotello concluded, to a reasonable degree of scientific certainty, that there was a "high likelihood of erroneous identification" in the petitioner's case.

¶ 56    After hearing the testimony and considering the exhibits offered in support of the petitioner's actual innocence claim, the circuit court denied the petition. The court found that the new evidence offered by the petitioner was not of such conclusive character that it would probably result in a retrial. In doing so, the court first noted that the trial evidence largely consisted of the testimony of three eyewitnesses, one of whom, Offord, was now recanting. As to the two remaining witnesses, Turner and Hart, the court found that their trial testimony presented "substantial evidence" of guilt because both testified consistently as to the events leading up to the shooting and identified the petitioner from a lineup and in open court during trial. As the court explained both "were very clear about their identifications of [the petitioner], their opportunity to observe what they saw" and "that there were *** two occasions," when they got a good look at him, the first during the conversation about the price of the car rims, and the

18

second, prior to the shooting.

¶ 57 The court next discussed the evidence offered by the petitioner in support of his actual innocence claim. The court found Dr. Rotello's expert testimony to be credible and "very impressive." In the context of that expert opinion, the court then discounted William's and Offord's testimonies as inconclusive. First, the court found Williams' testimony to be incredible and "completely undercut" by Dr. Rotello's expert opinion. Specifically, the court noted that Williams never said anything about the shooting for at least 15 years and then "under the very suspicious circumstances of being in custody on his own murder, talking to a friend of the petitioner's in jail *** all of a sudden" remembered that he had seen the shooting "and it definitely wasn't [the petitioner.]" Based on Dr. Rotello's testimony, the court found incredible that Williams could remember specifics of the incident, so many years later.

¶ 58 With respect to Offord, while the court did not necessarily disbelieve him, it questioned his recantation and found incredible his testimony that he did not see any faces during the shooting. Specifically, the court found relevant that in 2001 the police neither found nor forced Offord into anything and that, instead, he went to his school's principal of his own accord, spoke to her about the shooting, and subsequently identified the petitioner from a lineup. Moreover, at trial, Offord testified to the specifics of the crime, stated that he had a clear opportunity to view the shooter, and identified the petitioner as the shooter in open court. The circuit court noted that this subsequent identification was corroborated by the unrecanted testimonies of Hart and Turner and was "very clear[], very conclusive[], under cross-examination."

¶ 59 The circuit court found that in the context of Dr. Rotello's expert testimony regarding "identifications and non-identifications [being] influenced by other people," "for a variety of reasons, maybe talking to people," possibly "somebody on behalf of the petitioner," Offord now

19

"question[ed] himself about his identification." As the court went on, "I don't think that he's not credible in saying that. I think that so much time has passed, he has been influenced by several things" and "now questions himself." As the court concluded, "when I look at [his] previous testimony and *** how he testified in front of me, [Offord] still seem[s] like a scared person who now is questioning what's right and what's wrong," and that testimony, in and of itself, is not of such conclusive character that it would probably change the result on retrial.

¶ 60    The court ultimately concluded that when considered together, Offord's recantation, Williams' claim that the petitioner was not riding in the front passenger seat of the van, and the petitioner's testimony that at the time of the shooting he had moved out of the area to Moline and was arrested in Chicago only because he was there visiting with his family, were not of such a conclusive character that they would probably change the result on retrial. Accordingly, the court denied the petitioner's actual innocence claim. The petitioner now appeals from that third-stage denial of his petition.

¶ 61                                    II. ANALYSIS

¶ 62    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et. seq.* (West 2022)) provides a mechanism by which convicted defendants may assert a substantial deprivation of their federal or state constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)).

¶ 63    The Act provides a three-step procedure for postconviction relief. *People v. English*, 2013 IL 112890, ¶ 23. At the first stage, the circuit court must independently review the petition, taking the allegations as true, and determine whether " 'the petition is frivolous or patently without merit.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see

also *Tate*, 2012 IL 112214, ¶ 9. If the petition survives the first stage, the proceeding advances to the second stage where counsel is appointed and granted leave to amend the petition into an appropriate legal form. *Tate*, 2012 IL 112214, ¶ 10; see also *People v. Turner*, 187 Ill. 2d 406, 416-17 (1999). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a "substantial showing" of a constitutional violation. *Tate*, 2012 IL 112214, ¶ 10. If no such showing is made, the petition is dismissed. *Id*.

¶ 64    However, if a substantial showing is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing to determine the validity of the petition's factual allegations. *Id*.; see also 725 ILCS 5/122-6 (West 2022). At this stage, unlike the previous ones, the petitioner's allegations are not presumed to be true, and the petitioner must prove his claim by a preponderance of the evidence. *People v. Domagala*, 2013 IL 113668, ¶ 35; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Childress*, 191 Ill. 2d 168, 174 (2000); *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132.

¶ 65    At the third stage, the circuit court acts as a fact-finder and has wide discretion in deciding what evidence to consider. *People v. Reed*, 2020 IL 124940, ¶ 51; *People v. Williams*, 2017 IL (App) (1st) 152021, ¶ 22. Moreover, because it is in the best position to observe the demeanor of the testifying witnesses, the circuit court is vested with the responsibility of making credibility determinations, resolving conflicting testimony, and weighing the evidence offered. *Domagala*, 2103 IL 113688, ¶ 34; *Reed*, 2020 IL 124940, ¶ 51.

¶ 66    As a reviewing court, we may not reverse the circuit court's credibility determinations or fact-finding unless they are manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473; *English*, 2013 IL112890, ¶ 23. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98. Accordingly, a decision is

manifestly erroneous only when the opposite conclusion is clearly evident. *Id.*

¶ 67      In the present case, the petitioner contends that the circuit court's denial of his actual innocence claim, after an evidentiary hearing, was manifestly erroneous. We disagree.

¶ 68      To succeed on an actual innocence claim the petitioner was required to establish that the evidence offered at the hearing was: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing *Edwards,* 2012 IL 111711, ¶ 32). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. Material means that the evidence is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative means that the evidence adds to the information that the jury heard at trial. *Id.* Lastly, conclusive means that the new evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* ¶ 96.

¶ 69      In the present case, the evidence offered by the petitioner in support of his actual innocence claim consisted of: (1) his own alibi testimony, corroborated by affidavits from his girlfriend and her sister; (2) Williams' testimony that he did not see the petitioner inside the van at the time of the shooting; (3) Offord's recantation of his trial testimony; and (4) Dr. Rotello's expert opinion regarding the high likelihood of misidentification in this case.

¶ 70      At the outset, the petitioner concedes, and we agree, that his alibi testimony is not new since he was presumably aware of his own whereabouts at the time of the shooting and therefore had this information prior to trial. See *Robinson*, 2020 IL 123849, ¶ 53 (rejecting the petitioner's claim that his alibi was newly discovered where the "petitioner obviously was aware of that

information prior to trial."); see also *People v. Harris*, 206 Ill. 2d 293, 301 (2002) (rejecting the petitioner's claim that his alibi was newly discovered because the petitioner himself was "the source of this information and was armed with [it] at the time of [his] trial"); *People v. Edwards*, 2012 IL 11171, ¶ 37 (same); *People v. Jarrett*, 399 Ill. App. 3d 715, 723 (2010) (holding that "evidence is not 'newly discovered' when it presents facts already known to a defendant at or prior to trial"). To the extent that the petitioner argues that we may nonetheless consider this evidence because the circuit court did not explicitly discount it at the evidentiary hearing, and because it is part and parcel of the "new and old" evidence, which courts weigh in determining the probability of a different outcome on retrial, we strongly disagree. Our supreme court has been clear that when considering the conclusive nature of the evidence offered in support of an actual innocence claim, courts only weigh the new evidence, that which was discovered after trial with the exercise of due diligence, against the evidence that was presented at the original trial. *Coleman*, 2013 IL 113307, ¶ 97. This analysis does not extend to considering "old evidence" known to the petitioner prior to trial that he, for various reasons, chooses not to present. *Id.*; see also *People v. Mendoza*, 2024 IL App (1st) 231588, ¶ 35 ("[t]he essence of an actual innocence claim is that the evidence in question is new and could not have been discovered sooner"). Accordingly, we will not consider the petitioner's alibi testimony in reviewing his actual innocence claim.

¶ 71     The petitioner next concedes that because we must defer to the circuit court's credibility determinations, we may discount as incredible Williams' testimony at the evidentiary hearing that he did not see the petitioner inside the van at the time of the shooting. See *Reed*, 2020 IL 124940, ¶ 51. Again, we agree, and find nothing manifestly erroneous in the circuit court's conclusion that Williams' ability to remember specifics of an incident that occurred 15 years

ago, and of which he never spoke to anyone until he met the petitioner's friend in jail, and then suddenly remembered that the petitioner was not involved in the shooting, was incredulous.

¶ 72    Having disposed of these initial witnesses, we turn to the central argument raised by the petitioner on appeal and address the testimonies of Offord and Dr. Rotello. The parties agree that the evidence offered by these two witnesses was new, noncumulative, and material but dispute its conclusive nature. Specifically, the petitioner argues that because the evidence of his guilt at trial consisted solely of three "very tenuous identifications," and the jury's notes and split verdict reveal that the jurors were conflicted, Dr. Rotello's expert opinion that there was a high likelihood of misidentification, alone, had the potential to change the outcome on retrial. In this respect, the petitioner asserts that Dr. Rotello's testimony would have cast serious doubt on Turner's, Hart's and Offord's identifications of the petitioner as the shooter and challenged the prosecutor's argument in closing that memories get stronger over time and that stress results in more reliable identifications. In addition, on appeal, the petitioner argues that because the circuit court did not completely dismiss Offord's recantation of his trial testimony, when considered together with Dr. Rotello's expert opinion, the testimony of both witnesses together is of such conclusive character to require remand for a new trial. We disagree.

¶ 73    As already noted above, the conclusive character element requires that the petitioner present evidence placing the trial evidence in a different light that undermines the court's confidence in the judgment of guilt. *Robinson,* 2020 IL 123849, ¶ 56. New evidence is conclusive when, after considering it along with the trial evidence, a different result probably would occur. *Id.* ¶ 47. As our supreme court has explained:

> "The new evidence need not be entirely dispositive to be likely to alter the result on
>
> retrial. [Citation]. Probability, rather than certainty, is the key in considering whether the

fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 74    After reviewing the record, we find nothing manifestly erroneous in the circuit court's finding that it was improbable that Dr. Rotello's expert testimony, alone, or combined with Offord's recantation, would have resulted in the petitioner's acquittal upon retrial.

¶ 75    To begin, the circuit court correctly found that even with Offord's recantation, the evidence of the petitioner's guilt at trial was "substantial." That evidence consisted of the unrebutted and corroborative testimony of two eyewitnesses, Turner and Hart, both of whom had an opportunity to observe the petitioner at least once prior to the shooting. Both witnesses testified that on the morning of the incident they first observed the petitioner drive up in a van, lean out of the driver's window, and inquire about purchasing Turner's car rims. During this encounter, Turner was only five to six feet away, and Hart, who was 20 feet away, testified that he recognized the petitioner because he had previously seen him in the neighborhood. Both eyewitnesses testified that about 15 to 20 minutes after this initial, nonconfrontational encounter, the van returned and several armed men, including the petitioner, got out. Both witnesses then heard the petitioner ask Wilson about a Monte Carlo and Wilson respond that he did not know what the petitioner was talking about. Both witnesses affirmatively testified that they then saw the petitioner shoot Wilson. They both identified the petitioner as the shooter from separate lineups conducted on June 28, 2001, and then made in-court identifications of the petitioner at trial.

¶ 76    In contrast, the evidence offered by Dr. Rotello and Offord at the evidentiary hearing was unconvincing. While Dr. Rotello plausibly testified to a myriad of pitfalls associated with eyewitness identifications and opined that in the present case there was a possibility that the

petitioner was misidentified as the shooter, her testimony served only to impeach. "Where evidence merely impeaches trial testimony, it is not typically of such conclusive character as to justify postconviction relief." *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 58; *People v. Brown*, 2020 IL App (1st) 190828, ¶¶ 70-71 (citing *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008), *overruled on other grounds by Robinson*, 2020 IL 123849) (holding that where the evidence offered by an expert on witness identifications at a third-stage evidentiary hearing only served to impeach and therefore undermine the credibility of the State's witnesses it was not of such conclusive character as to require a retrial); see also *People v. Smith*, 2024 IL App (1st) 210496-U, ¶ 32[6]; *but see People v. Martinez*, 2021 IL App (1st) 190490, ¶¶ 116-17, *overruled on other grounds by People v. Flournoy*, 2024 IL 129353 (holding that a report by an expert on witness identifications attached in support of a postconviction petition, reviewed at the second-stage, when, taken as true, was of such conclusive character as to require remand for an evidentiary hearing). In the context of the unrebutted and consistent trial testimonies of Hart and Turner and their dual lineup and in-court identifications of the petitioner as the shooter, it was not manifestly erroneous for the circuit court to conclude that such impeachment evidence, standing on its own, was not of such conclusive character that it could lead to a different result on retrial.

¶ 77     The petitioner's reliance on our supreme court's decision in *People v. Lerma*, 2016 IL 118496, for the opposite conclusion is misplaced. In that case, our supreme court considered whether the trial court had abused its discretion in prohibiting an eyewitness identification expert from testifying at the defendant's trial and found that it had. *Id*. ¶ 32. At no point, however, did

---

[6] See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

our supreme court discuss whether such eyewitness expert testimony might be conclusive enough to call into doubt a conviction, such as the one here, challenged by way of an actual innocence claim at a third-stage postconviction evidentiary hearing. Accordingly, *Lerma* in no way compels a finding that the circuit court's conclusion regarding Dr. Rotello, here, was manifestly erroneous.

¶ 78    Turning to Offord's testimony, we similarly disagree with the petitioner that it is of such conclusive character that when considered with Dr. Rotello's expert opinion, it has the potential to lead to a different result on retrial. In that respect, we observe that even though the circuit court believed Offord was genuinely questioning his prior identification of the petitioner as the shooter, it explicitly found incredulous Offord's claim that he did not see the shooter's face. We, again, find nothing manifestly erroneous in this conclusion. First, "[i]t is well settled that the recantation of testimony is generally regarded as unreliable." *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Moreover, Offord's testimony at the evidentiary hearing was, at best, conflicted and confused. On one hand, Offord claimed that while he never saw the shooters' faces, until recently he told no one. On the other, he testified that the day after the shooting of his own accord he told his school principal what he had seen because he felt guilty about not having spoken to the police and then told a police detective "the truth." Furthermore, Offord admitted that his instant recantation, over ten years after the crime, was motivated by conversations with "mutual friends" in the neighborhood, who began reaching out to him on the petitioner's behalf, and that his belief that the petitioner could be one of those people "in prison for crimes that they didn't do" was not based on any facts but rather on "stuff that people [were] talking about." For these reasons, while accepting the sincerity of Offord's doubts, the circuit court aptly refused to

believe Offord's claim that he did not see the shooter's face.

¶ 79    Since we find nothing manifestly erroneous in the court's assessment of either the veracity or weight to be given Offord's and Dr. Rotello's testimonies, we have no reason to second-guess or overturn the circuit court's conclusion. From the record it is evident to us that the circuit court properly considered the new evidence in context of the entirety of the trial evidence focusing on "[p]robability, not certainty" in predicting what another jury would do and concluded that in light of the unrebutted eyewitness testimonies of Turner and Hart there was no need for a new trial. *Coleman*, 2013 IL 113307, ¶ 97. We agree with this assessment and therefore affirm the circuit court's denial of the petitioner's actual innocence claim.

¶ 80                                III. CONCLUSION

¶ 81    For these reasons, we affirm he judgment of the circuit court.

¶ 82    Affirmed.